**CITY OF FULTON, Missouri, Plaintiff-Respondent,**

v.

**Mrs. G. Roy DAWSON et al., Defendants-Appellants.**

**No. 22977.**

Kansas City Court of Appeals. Missouri.

June 1, 1959.

David V. Bear and Robert Hines, Columbia, for appellant.

Clyde Burch, City Atty., Fulton, for respondent.

HUNTER, Judge.

This is an action by the City of Fulton, as plaintiff, for a declaratory judgment authorizing it to annex a surrounding contiguous area of approximately 1387 acres. Numerous inhabitants of the proposed-to-be annexed area were named as defendants, and others were given leave to intervene. Hereafter in referring to defendants for expediency purposes we include all intervenors.

Plaintiff City brings this suit pursuant to Section 71.015 RSMo 1949 (Supp.1955), V.A.M.S., which provides that before a city may proceed to annex any area otherwise authorized by law, it must file an action in the circuit court of the county in which such unincorporated area is situated praying for a declaratory judgment authorizing such annexation.

According to the mentioned statute, "The petition in such action shall state facts showing:

"1. The area to be annexed;

"2. That such annexation is reasonable and necessary to the proper development of said city; and

"3. The ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective. Such action shall be a class action against the inhabitants of such unincorporated area under the provisions of section 507.070, RSMo."

Plaintiff's petition contains the requisite allegations of fact, and upon trial, the circuit court held that the evidence adduced in support thereof showed that plaintiff has fully complied with Section 71.015 RSMo 1949, V.A.M.S., and that the City of Fulton is authorized to annex the described territory. It entered judgment accordingly. In due time the defendants filed their motion for a new trial and upon it being overruled perfected this appeal.

On this appeal, defendants urge the trial court erred in authorizing the City of Fulton to annex the contiguous unincorporated land because (1) The land supposed to be annexed is largely agricultural and its value in respect to its adaptability to city uses is not greatly in excess of its value for use as agricultural or pasture land; (2) Plaintiff

failed to sustain its burden of proof that the proposed annexation was reasonable; (3) Or was necessary to the development of plaintiff city; or (4) Did not prove that the city has the ability to furnish its normal municipal services to the unincorporated area within a reasonable time; and (5) That the Fenley farm and other farms in the proposed-to-be annexed area were not reasonably necessary to the development of the city—each and all resulting in such annexation being unreasonable, arbitrary and capricious.

Section 71.015 is generally referred to as the Sawyers Act and was passed by the 67th General Assembly in 1953. Its constitutionality was upheld by the Supreme Court in City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 9. In that decision the court said, loc. cit. 9: "We construe § 71.-015 as merely giving to the courts, in advance of a consummated annexation, the same judicial power and authority to test the reasonableness and necessity for annexation which they have always exercised after its completion; that is to say, to decide whether the legislative declaration by the city is so palpably unreasonable and unnecessary as to be an arbitrary and oppressive exercise of its legislative power. Considered in this light, the change is procedural, and the legislature has not delegated to the courts the power to determine reasonableness or necessity in the first instance, as would a legislative body. * * * Subsection 3 of § 71.015 requires the allegation of the city's ability to furnish normal municipal services within a reasonable time. That requires merely a finding of facts, pure and simple. * * * it also requires the city to show, prima facie, that the discretionary and legislative powers have not been unreasonably and arbitrarily exercised. To this extent the city must produce evidence of reasonableness, and to this extent the statute places the burden of proof upon the city."

We proceed to summarize the evidence and in some instances to give only our conclusions as to what it shows. With a rec-

ord consisting of two volumes of testimony in excess of 60 pages and a third volume of numerous detailed exhibits, we cannot do otherwise and stay within the bounds of an opinion of reasonable length.

Fulton is a city of third class with an approximate area of 2.5 square miles, or 1720 acres. Its present population is slightly in excess of 10,000 as compared with 8,-297 in 1940 and 6,105 in 1930. It proposes to annex approximately 1,387 acres of land contiguous to it and surrounding it. On October 10, 1956, the City Council of Fulton passed its annexing ordinance and called for a special election by the legal voters of Fulton to determine if a majority were in favor of the proposed annexation. This ordinance directed the institution of this declaratory judgment action.

The proposed-to-be annexed land is owned by approximately 105 separate owners including in addition to individual owners, Missouri State Hospital No. 1, (140 acres); Missouri School for the Deaf, (40 acres); William Woods College, (16 acres); and Westminster College. Among the larger individual owners, who vigorously opposed the proposed annexation, are Mrs. G. Roy Dawson, (103 acres); Mrs. Margaret Fenley, (70 acres); and Ernest Mirts, (5 acres off the front of his 80 acre farm).

According to numerous witnesses Fulton is experiencing a healthy and substantial population and business growth. It has an immediate need for more land for residential and business building purposes. Vacant land suitable for such purposes within the present city limits is scarce, and it is necessary to annex as proposed in order to meet these needs of the city.

Fulton's mayor, Edward Estes, testified that numerous new industries and installations have located in Fulton during the past five years. These include the Laclede Christy Experiment and Testing Station; Central Electric Corporation; a new R. E. A. Building; Missouri Concrete; I. G. A. Foodliner; Montgomery Ward; Travelier Motel; Ovid Bell Press expansion; Davis

Paint Company; State Hospital expansion; Westminster College expansion; and William Woods expansion—as to put it "to name a few". The mayor also named eight new subdivisions that have gone in during the past year or were in the process thereof as (1) Dr. Durst's, (2) Paul Herring's, (3) T. J. Neukomm's, (4) the South School subdivision, (5) McIntire's, (6) Tucker's, (7) Acree's and Whitlow's.

Additionally, the mayor testified: Fulton is growing rapidly. Building sites for either residential or other purposes are very scarce inside the city. He has requests all the time for private building lots from contractors both for home building and for industrial purposes. Approximately two years ago, somewhat as a result of numerous requests from individuals trying to find locations to build houses and the recognition of the City Council that the city was in the process of growing pains ("we have just outgrown our town"), a city planning commission, comprising eighteen members was formed. After considerable study this commission asked that the city extend its city limits. The City Council after taking into consideration such things as health problems, sewers, zoning, water, lights, gas, and other related matters, asked the people for a bond issue to extend and expand its utilities, and the council passed the mentioned annexing ordinance. It is desirable to bring in the proposed area not only because it is needed to give the city needed territory for the construction of homes and business buildings but because of zoning and police considerations.

Mayor Estes explained: Fulton's city limits come right up to the Dawson property and stop, this being a north boundary. To the northeast, the city can't grow because of the Harbison Walker land and heavy terrain. There are undesirable properties springing up around the city, and it would be a great advantage to the city to be able to zone that area. As to building sites, Dr. Durst's subdivision has six lots and they are possibly all sold. The Herring subdivision has about ten or twelve

lots, all sold. The Neukomm subdivision has six houses. The South School subdivision, owned by the St. Louis Construction Company, has about 200 lots with about 100 of them unsold. This company builds prefabricated houses, and the prospective purchaser is expected to buy a house and lot together which decreases any demand for them.

With regard to the Fire and Police Departments the mayor testified: Fulton's fire department is adequate to give protection to the proposed-to-be annexed area. This opinion is supported by a recent study made by the Missouri Inspection Bureau. At the present time Fulton is answering all fire calls within a reasonable distance outside its present city limits, including the proposed-to-be annexed area. The fire department has two pump trucks equipped with ladders and hoses. It has five firemen on full time duty, and available on call are an additional eighteen volunteer firemen.

Fulton's police department consists of nine regularly employed police officers who work three shifts around the clock. All of them are subject to call at any time. It has one patrol car and a radio equipped motorcycle. In contemplation of the annexation and other requirements, the police department with the support of the mayor is requesting an increase of the police budget. However, the mayor believes the present force could by extra effort police the present city and the proposed-to-be annexed area.

Woodrow W. Lewis, Chief of Police, testified: The annexation would be desirable from the standpoint of law enforcement. The city has an adequaate force to furnish police protection to the proposed-to-be annexed area, and is practically doing that now. Fulton's police make about 90% of the disturbance calls and practically all of the automobile accident calls within a mile or mile and a half of town. They handle traffic until the highway patrol can get there to take over. The city has a speed problem of traffic coming in from the south and north on Highway 54, which could be

controlled better if the proposed extension of city limits takes place. On the highway leading to Columbia the present city limits on the north side of the highway are about two or three blocks farther out than on the south side of the highway resulting in enforcement problems. Another problem is the present city limits are just a short distance beyond the South School and as the city can't control traffic until it arrives at the city limits the automobiles pass through the school zone before they can be slowed down. This results in a serious traffic hazard to the school children. He receives many calls involving incidents just outside the city but cannot make arrests there.

Chief Lewis concedes the present city police force has less personnel than that recommended by the International Association of Chiefs of Police, but notes that its recommendations are far in excess of the national average for comparable towns. The city also has a working agreement with Mexico, Columbia, and Jefferson City that at any time it needs extra help with traffic, or anything, those cities will send men to Fulton, and Fulton reciprocates with them upon request. In case of an emergency he can call on the local American Legion's auxiliary police force.

Clinton Harris, Fire Chief of Fulton, testified: The fire department is adequate to furnish fire protection to the proposed-to-be annexed area, and it has been furnishing that protection. In the past year they have added four full time firemen. The personnel and equipment now includes five full time firemen and two fire trucks; one with a 500 gallon pump and carrying 200 gallons of water, and the other with a 750 gallon pump and carrying 300 gallons of water. The regular personnel is augmented in a matter of minutes by trained volunteers. The pressure pumps of the Fulton water system are adequate to create sufficient pressure in the area to be annexed to permit installation of fire plugs. He has been advised by a fire engineer with the Missouri Inspection Bureau which inspected the city fire equipment, that the city has sufficient personnel and equipment to defend the area purposed-to-be annexed.

The City Council's fire committee has agreed to double its monthly deposits in the new equipment fund for fire purposes in its next year's budget to facilitate it carrying out the recommendations of the Missouri Inspection Bureau. They plan on a new fire truck as quickly as they can get it. The city has a mutual agreement with Mexico, Columbia and Jefferson City for mutual aid in fire emergency.

Eugene Hale, consulting engineer for the city and a partner in a St. Louis engineering firm testified: The present power plant of the City has an installed capacity of 6,000 kilowatts of generating equipment. This can be augmented by the procurement of 1500 kilowatts from the Southwestern Power Administration. Additionally, the City Council is proceeding with the installation of 6,000 additional kilowatts with a turbine generator which is under procurement and which will be in operation next year. Because Fulton is experiencing a considerable load growth it will require this additional equipment by the time it is installed. With the additional installed equipment the city can adequately serve both its present territory and that proposed-to-be annexed. It is presently providing electricity to that area.

Ovid H. Bell, chairman of the Planning Commission of Fulton, testified: The City's Planning Commission over a period of several years made a careful study of Fulton's annexation problem. Originally it recommended that the city annex a larger area than that presently proposed. It was the opinion of the Planning Commission that for Fulton to grow properly; for it to plan the platting of streets and to extend present street platting on into other areas; and for it to make worthwhile its zoning ordinance the city needed undeveloped property under city control before it was developed and built. Only this would permit proper zoning and platting. The tax revenue produced from any annexed land would

merely go toward defraying the services the city would be expected to render to those areas. The city would build streets as required, and sewers by means of sewer districts as was done within the corporate limits. While the present police force is "barely adequate" for the present city, it had been discussed and agreed that additional police forces should be provided as the additional area was added. Municipal services would be rendered in the annexed area in proportion to the need. The city is willing to undertake the obligation of defending all fires within the proposed-to-be annexed area. Taking the proposed-to-be annexed area as a whole plan the city does need that entire area. The old city limits are grotesque and have a triangular shape on the southwest end. One of the things the proposed annexation will accomplish is to square out the city limits line and establish an area readily serviceable by the city.

Paul Worsham, Fulton Building Inspector and Superintendent of its Disposal Plant, testified: The present city disposal plant has sufficient capacity to handle the sewage for the additional areas to be annexed. He supported his opinion with detailed testimony concerning the plant's capacity.

Jack K. Smith, Water Pollution Control expert for the State Department of Health, testified that it would be necessary for the city to increase the digestive capacity of its present sewage disposal plant if as many as 1500 more people were added.

Francis Austin, an employee of the Missouri Inspection Bureau, whose principal function is to establish insurance rates, including fire and windstorm, testified: Fulton presently is in basic Classification 8 for fire rating purposes. This rate is comparable to that of other towns of similar size. The city's fire department is adequate with present equipment and men for the approximately 1.6 miles of additional square area to be added by the proposed annexation. The city would remain in Class 8.

The newly added area would be rated Class 9, which rate is substantially lower than the farm rate and would result in those in the to-be-annexed area paying a substantially reduced rate for fire insurance. A still better rate would result when city water mains were extended into the new areas. His bureau, at the request of the city, made a study as to what would be necessary to provide adequate facilities to these outlying areas. The study revealed the present source of supply of water for the city is adequate, and meets the requirements for the Class 8 protection the city has. The residual water pressure is likewise generally adequate. When asked whether or not the water supply and the fire department were adequate to furnish the water and fire protection to the proposed-to-be annexed areas if they were built up, he answered: "Your water supply is adequate; your fire department is adequate; your water distribution system is deficient in many of the outlying areas at the present time (and we have made recommendations) to improve the distribution system * * * in anticipation of some of these annexed areas." The city is anticipating an additional elevated water tank.

Elrow Crane, Superintendent of Utilities of Fulton, with the aid of a prepared map of the city, gave information relative to the use of utilities by those people living in the proposed-to-be annexed area. He stated that Fulton is in a position from the standpoint of capacity to furnish utilities to the areas to be annexed as needed.

W. Victor Hill, Superintendent of Schools of the Fulton School District, testified as to the continuing growth of the enrollment and also as to the growth of the financial receipts of the district. The school experienced a growth from 1952–1953's 300 residential students in high school to 420 in 1955–56. It is necessary that the school build 10 or 12 new school rooms within two years to take care of the increase in children. He does not know of any suitable property on which a school building could be located inside the city limits. He advises

they need a minimum of 10 acres and might use as much as 50 acres. There are very desirable school locations just adjacent to the city limits on the north in the to-be-annexed area. The present irregular city boundary has caused some difficulty in determining those eligible to attend, for non-resident students are not accepted in the elementary schools.

Dr. Robert Davidson, president of Westminster College, testified as to the substantial growth in the number of students in this college. He anticipated a growth of 50% more student population in the coming year for a total of some 500 students. Presently the students are housed primarily in college owned housing. About 100 live in the town and off the campus. The college owned housing is on the campus. This school is spending within the next ten years 2½ million dollars for college expansion and expect to increase to a minimum of 650 students. The college is trying to acquire more land for its expansion and residential housing needs.

Robert Seman, business manager of State Hospital No. 1, testified: One of the larger buildings of the hospital is outside the city limits while the others are inside the city limits. It would be advantageous for this state institution to be annexed from the standpoint of fire protection and police patrol assistance in patroling the grounds and helping with general police duties. Occasionally the city police have to chase escapees from the building outside the city limits. At the present time this state hospital has a building program of some $3,000,-000. Part of the proposed buildings will be outside of the present city limits and in the proposed-to-be annexed area.

Numerous owners of small tracts of land in the proposed-to-be annexed area testified as to their desire to be annexed.

Parmer Clardy, owner of 50 acres in the proposed-to-be annexed area, testified he desired to be annexed. He bought this land for a farm but if it goes in the city limits he plans to subdivide and sell lots off of it.

H. L. Hinkle, who owns 6 acres in the area to be annexed had it surveyed and subdivided a week before the present trial. Originally he opposed annexation but now favors it. He has experienced a demand from the public for land in the proposed-to-be annexed area; has sold one lot; and has three or four lots contracted for as he gets utilities.

Mrs. Lloyd Clardy, who lives in the proposed-to-be annexed area, favors annexation particularly because the city doesn't want her children to go to South School, which is about four blocks from her home, unless they reside in the city limits. If they don't go there they would have a 5½ mile walk and a need to cross the public highway.

Walter Wolking, a resident of the proposed-to-be annexed area favored annexation. Of the 170 acres he owned 15 are in the city and 75 would be annexed. He is presently farming his land but has experienced some demand for it for subdivision use. He described a railroad siding directly south of his land and bordering a portion of it.

Paul Herring, residential home builder, recently purchased property in the area to be annexed and has subdivided it. He has completed two houses and has two more started. He favors annexation. He testified that so far as finding suitable building lots in town is concerned "Well they are pretty hard to find—there aren't any left. Q. There aren't any? A. Not to speak of."

James Reed, a home builder, testified that he has a new subdivision going up just outside the present city limits and in the proposed-to-be annexed area, and desires to be annexed.

Lawrence Owen recently purchased a lot in the area to be annexed and plans to build on it. He favors annexation.

Mr. T. J. Neukomm, a realtor, familiar with subdivision work, testified that he has had quite a few calls for building lots inside Fulton and there are not "too many available."

Scott Starkey, realtor, testified that there has been an increasing demand for the past 10 or 12 years for residential real estate inside Fulton, and this demand has been exceedingly great in the last two years. He stated that it was impossible to satisfy the demand; that there are very few building lots available and a portion of those available are being held because lots are scarce and thus held for speculative investment purposes.

Harvey Clapp, realtor, testified the St. Louis Construction Company does have three specific lots priced for sale which have been on the market for approximately three months; that in the city of Fulton there are about 100 odd lots that are available for building purposes scattered through various subdivisions and assorted locations.

H. L. Stine owns undeveloped land just north of the present city limits for which he has had numerous offers of purchase. However, the Army presently is condemning a portion of it for Army use, and that portion thus is not available for other building needs.

W. C. Whitlow, a member of the City Zoning Commission, who owns 180 acres of land on the south edge of Fulton in the proposed-to-be annexed area, favors annexation. He testified there are no subdivisions developing near his property. They are all developed and filled up.

. Byron Dysart, City Clerk, testified: The city tax rate is 90¢ per $100. The city has voted a $500,000 bond issue for the improvement of the power plant. There is $400,000 in bonds payable or outstanding termed "Water and Light Bonds". The city has in the total reserve water, gas, and electricity operating funds $222,000. These funds are available at the present time if the city had to use them. Of this sum approximately $175,000 is in the reserve fund. The city would need only $100,000 out of the reserve fund toward the cost of the improvement of the power plant and generator. Although he admits that it might be possible the city would need to raise its tax rate of 90¢, he stated the annexation would not have anything to do with causing such an increase. He mentioned a private understanding on the part of the present City Council to extend water mains as needed.

Plaintiff's Exhibit No. 4 is a map of Fulton dated 1955 showing: (1) The present area of Fulton to be 1,720 acres; (2) The area used for residential lots is 1,200 acres; (3) There are approximately 8 persons per acre; (4) There were 30 building permits for new homes between July 28, and December 31, 1956; (5) The rate of new home buildings is at the rate of 1 every 5 days; and (6) The utilization of new land for residences is at the rate of 1 acre per week.

Among those opposing the annexation are Mrs. G. Roy Dawson, who with her husband owns 103 acres on the north side of Fulton, and Mrs. Margaret Fenley, who owns 70 acres.

Mrs. Dawson testified: Of the 143 acres she owns on the north side of Fulton, the proposed annexation will take in 80 acres on the east side of Highway No. 54, and 23 acres on the west side. She and her husband purchased the property in 1922 and have used it for farm purposes through the years. At the present time it is rented to a Mr. Fox for $450 per year, exclusive of the two houses on it. She lives in one of the two houses. The rented land is presently used for grazing. She had lived on the land since 1892 and even if the city should annex it she would not sell it or subdivide it. She stated that while none of the city streets dead-ended on her property there is a subdivision that dead-ends on the road that runs along the south side of her property.

Other witnesses testified concerning this property. Mr. Calder, city engineer of Fulton, stated that the farm lies nice and many of the city streets dead-end on or near it. Those streets are presently served by city utilities and sewers.

Mayor Estes testified, "The Dawson property which lays directly north of our present city limits is holding up the progress of our city. In proof of that * * * beyond the Dawson property is a subdivision that is growing very fast and our city streets dead-end on account of the Dawson property, and it lays in a position that is very valuable land out there for the city." He stated that the west portion of the Dawson property that lays between the railroad and the highway is suitable for commercial or industrial development.

Jim Gallaher, a Mexico, Missouri, realtor, testified he had developed six subdivisions out of rural land similar to the Dawson property and that as farm land the Dawson land would be worth $100-$125 an acre, but for subdivision purposes would be worth $350-$400 an acre.

T. J. Neukomm, a realtor and appraiser, testified the Dawson property was worth about $125-$135 an acre for agricultural use, but from $350 to $500 an acre for subdivision use and that it was very desirable land for subdivision development. He stated its value for the entire farm was $200 an acre but a subdivider buying a reasonable acreage of 15 to 20 acres might pay $400 to $450 an acre for the small acreage.

Ovid Bell stated that there is beyond the Dawson property considerable development, including urban, commercial and residential tracts.

Harvey Clapp, realtor, testified that he was familiar with the Dawson property and that there would be a demand for residential lots if it were subdivided in a suitable manner.

The other tract, referred to as the Fenley tract, was inherited in 1938 by Mrs. Margaret Fenley from her sister. Mrs. Fenley testified: The tract has a seven room stone house on it. Most of the land is quite rough. Crossing it is a ravine about 75 feet deep. Immediately in front of the house are numerous high mounds of overburden rising some 20 to 25 feet. These resulted in years past from the removal of earth in clay strip mining operations. This overburden occupies approximately 50 acres. The part of her tract that the city is taking in is among the roughest. At the present time she is operating her land as a single farm for grazing. Her tenant pays her an annual rental of $130 excluding the house in which she lives. She does not wish to pay the city tax rate on the approximately 60 acres of land the city proposes to annex. In her opinion this area would not be adaptable to subdivision purposes. In years gone by clay has been mined on her land and she believes there are still mineral deposits of clay on it. She is holding her land for the benefit she might reap on these deposits. A portion of her land is adjacent to that owned by Westminster College. A good deal of her land has no agricultural value. The assessed value of her entire farm is $7,500. There has been no income from clay mining for over 11 years. She doubts if she could mine it under present city ordinances if it was taken in.

Fulton's City Engineer, Calder, testified: The Fenley farm is needed for expansion. Fourth Street ends just short of the Fenley property at Stinson Creek. The city has no plans for the construction of a bridge which would be necessary to give direct access to that tract.

Mayor Estes testified as to the devious route necessary to be taken to get to the Fenley tract. Access to her home from the border of her tract is by private road. To get to that point it is necessary to cross Stinson Creek on Second Street and go three quarters of a mile south on the old Jefferson City Road

and then cut back a mile north. He stated part of the Fenley farm is highly desirable for subdivision purposes—the part back southeast where you go into the gate—over toward Mr. Mirts' land. That portion is fairly smooth and level. He believes the Fenley land is worth substantially more because of its proximity to Fulton than it would be worth just for agricultural or other purposes. He thinks it has an additional value as a residential area and that a portion of it is desirable for residential subdivision use. The clay mine once operated there has been abandoned. He stated that unless the city took in the designated portion it would be unable to straighten the boundary of the whole city as it desired to do. He did not know of any new construction in the area of the Fenley farm.

Mr. Neukomm testified that the Fenley tract, because of its location and typography, is not too well suited for subdivision purposes. He appraised it at $50 an acre. He does attribute ⅓ of that $50 value to the fact it is somewhat suitable for subdivision because of its proximity to the city.

Mr. Bell testified that without a bridge where Fourth Street dead-ends he did not think it practical to attempt subdividing the Fenley tract. One consideration favoring the annexation of the Fenley tract was that it lay in an area between two other areas logically a part of the town. He thinks the land has no present value except for agricultural purposes. He stated that if you consider the annexation plan as a whole, including the Fenley tract, "The city needs them". "If you took those (Fenley tract) out and tried to draw a boundary so that would be excluded the pattern would be more or less ridiculous." He concedes there is no immediate need for the Fenley property for subdivision purposes. The bringing in of the Fenley property would make the city boundary regular.

Mr. Paul Herring testified that the Fenley farm might be desirable for subdivision purposes at a later date—parts of it would be all right.

Mr. Truitt, city councilman, testified that the principal reason for running the line across the Fenley farm in the manner done was to straighten out the boundary of the city. The Fenley home is 9/10 of a mile from the present city water line.

Mr. Clapp testified the Fenley farm was worth between $50 and $75 an acre. Its terrain is very rough. It has a limited access. Its present value is agricultural only.

Dr. Davidson testified: His college is trying to acquire more land. The Fenley land between his college and Mrs. Fenley's home is extremely rough and hilly and includes strip bed areas. It would have a value to his college as a gift. He believes someone could grade it off and that is what he would do with it if he obtained it. He probably would use it for faculty housing. "If you graded those hills off it would be a very nice residential area." It could be a good subdivision. It is very desirable for the growth and expansion of Westminster College.

Nelson West testified the Fenley farm would not be considered a high type of subdivision ground on account of the terrain. The flat low part of it would be subject to overflow. The high part is rough. He acknowledged the large mounds of overburden from the clay pits that were on it. To have reasonable access to the tract it would mean building a bridge across Stinson Creek at a cost of around $35,000 to $40,000. Mrs. Fenley's home and other improvements lie within the part to be annexed. The actual annexation line goes around 600 to 700 feet west of her home.

Another objector, Ernest Mirts, owner of an 80 acre farm one mile southwest of the city testified: The proposed annexation would take in around 6 acres of his land, including his house and barn. He concedes that Chestnut Street dead-ends

just across the road from his yard fence. There are a few non-farm residential homes around him.

Numerous exhibits were introduced by plaintiff city including such things as a map showing the present location of the water system of the city, including water mains and fire plugs; the utility records of the city for 1953 and 1956; a map showing utilities, schools, parks and business areas of the city, aerial photographs of the city; photographs of various areas of the city including the Fenley farm, a traffic flow map; records of the disposal plant; building inspection permits; map prepared by the Missouri Inspection Bureau; photographs of the Dawson Homestead, and the Mirts farm; the city fire prevention ordinance; the annexation ordinance; a statement of Frank P. Baker concerning the increasing assets of the Fulton Building and Loan Association to illustrate business increase in the city; a map of the Fulton school district; a map showing city utilities customers in the proposed annexed area; a map showing the proposed city limits as well as the present city limits and various statements of the Callaway Bank for the years 1951 and 1956, offered to illustrate a condition of growth within the city.

█ It is our duty in this declaratory judgment action to review the case de novo as to all matters properly before us and to reach our own conclusions with respect to the law and the facts. In so doing, we consider, weigh and evaluate all of the competent evidence. We accord due deference to the trial court's findings, particularly where the credibility of witnesses who appeared before it is challenged. Sections 527.070 and 510.310 RSMo 1949, V.A.M.S.

█ First, we note plaintiff has fully satisfied the mandatory class action requirements of the Sawyers Act by its selection of defendants who adequately and fairly represent the whole class. Section 507.070 RSMo 1949, V.A.M.S., Supreme Court Rule 3.07,

42 V.A.M.S.; City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546, 553, 554.

The City of Fulton acted under authority of Section 77.020 RSMo 1949, V.A.M.S., authorizing its council, with the consent of a majority of its voters to annex "in such manner as in their judgment and discretion may redound to the benefit of the city."

█ There must be in fact a reasonable basis for a proposed annexation in order for it to be valid. Since the annexing statute does not give those whose property is being annexed any voice or vote on the annexation they do have the right, through the courts, to a judicial review of the claimed factual basis supporting the annexation. On such a review it is not the function of the courts to substitute their judgment for that of the City Council and the electorate. If the evidence is such that reasonable men would differ as to the necessity of the extension then the decision of that question is for the City Council and the city electorate and not for the courts. When the evidence shows a fairly debatable question about the matter, then either way the question might be decided would not be unreasonable. State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 398.

In this State we have developed certain so called tests—or more accurately, certain guides that give valuable aid in determining whether or not the particular annexation has a reasonable basis. We proceed to set out some of those general guides which, to an extent, have a bearing on the facts appearing in this case. Numerous of them are listed in Dressel v. City of Crestwood, Mo. App., 257 S.W.2d 236, loc. cit. 248: " 'The test to be applied in determining the reasonableness of a proposed expansion of city limits must obviously be largely a flexible one. However, the appellate courts, in the disposition of cases of this character, have made some general observations which are highly pertinent to the matter at hand, to the effect that existing boundaries may properly be extended so as to take in contiguous lands: (1) When they are platted, and held

for sale as town lots; (2) whether platted or not, if they are subject to be brought on the market, and sold as town property when they reach a value corresponding with the views of the owners; (3) when they furnish the abode for a densely settled community, or represent the actual growth of the municipality beyond its legal limits; (4) when they are needed for any proper town purposes, as for the extension of streets, sewer, gas, or water systems, or to supply places for the abode or business of its residents, or for the extension of needed police regulation; and (5) when their value is enhanced by reason of their adaptability for prospective town uses.' * * * It is not necessary that all of the conditions which we have named as proper to be considered in determining the question or reasonableness should be present before an annexation will be declared valid. On the contrary, a case of reasonableness is made where it appears that the land annexed is so situated as to be adaptable to urban purposes, and necessary or convenient to a reasonable exercise of the city government. And this is so even though a part of the land is vacant, or a small portion thereof is used for agricultural purposes, (citations). * * *"

From Mauzy v. City of Pagedale, Mo. App., 260 S.W.2d 860, 864: "In fact, there can be no hard and fast rule laid down for determining the reasonableness of a proposed extension; and a case of reasonableness is made when it appears that the land annexed is so situated as to be adapted to urban purposes, and as to be necessary or convenient to a proper exercise of the city government, even though a portion of the land may be as yet undeveloped or in use for agricultural purposes."

From State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762, 774: "Upon this question we also consider whether the territory proposed to be annexed has city advantages, or would make the city limits regular * * *." See, also, 62 C.J.S. Municipal Corporations § 44, p. 127 ff.

The picture presented by the evidence is that of a well organized growing city which has a present need for a substantial amount of land both for home building and commercial building purposes. This needed land cannot be obtained in sufficient quantity within the present city limits. In so saying we acknowledge there are some unbuilt on tracts within the city that vary greatly in their desirability as building lots. Yet it is apparent that they do not meet the actual present building needs of Fulton. Additionally, the history of Fulton is one of continuous growth and the city is entitled to look ahead and provide for its development for several years to come. City of St. Ann v. Buschard, supra, loc. cit. 552; Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, 249.

Defendants' primary contention is that the land proposed-to-be annexed is largely agricultural land whose value for city uses is not "greatly" in excess of its value as agricultural or pasture land, and, hence, its annexation would be unreasonable and void. The evidence is not such as to permit us to say with certainty just how much of the 1675 acres is actually being farmed or otherwise used for agricultural purposes. Defendants say the evidence supports a conclusion that 701 acres is all agricultural. In so saying they include as agricultural the 70 acre Fenley tract, which, less housing, rents for only $130 annually for "pasture". Mrs. Fenley claims its principal value is as potential mining land (industrial), not agricultural. They also include the 80 acre Mirts tract, although only approximately 6 acres of it is to be annexed. Additionally they include several tracts, such as the Devers' seven-acre tract, which are so small as to raise some question as to their being true farm land. Cf. City of St. Joseph v. Hankinson, supra, 312 S.W.2d loc. cit. 15.

The fact, if it be a fact, that 701 acres of the 1675 is used for farming or grazing purposes does not of itself mean that the city's exercise of its legislative de-

cision to annex it is so unreasonable as to be an abuse of its legislative powers. Rather it is but a factor to be considered along with the other pertinent factors comprising the total picture, and all should be considered in determining whether the municipality's council has abused its lawful legislative discretion. No single fact or item should be isolated from the other facts or considered out of context. Each case is a separate problem to be considered on all its facts. Considering the amount, nature, use and value of the land proposed to be taken, the present need of the city for more land for building purposes, and to a reasonable extent, its future needs in that regard and the adaptability of the land to urban purposes as well as other previously mentioned considerations that bear on the question although to a lesser degree, we are unable to conclude that the city abused its legislative discretion in including the mentioned "farm land" in its proposed annexation.

 Somewhat as a corrollary defendants contend the Fenley farm, and others unnamed, were not reasonably necessary to the development of the city, making the entire annexation unreasonable even if there was a sound reason to annex other land. Courts must take the proposed annexation as a whole in determining reasonableness, and are not permitted to say that the council might have more reasonably exercised its discretion if it had proposed to annex less, or more, land; or had excluded, or included, certain areas. There is evidence that to some extent, even though limited, the Fenley land is able to be used for residential building purposes. In order for Fulton to straighten out its proposed boundary line it is necessary to take the described portion of the Fenley tract. Under such circumstances as appear here we are unwilling to say the inclusion of a portion of the Fenley tract in the proposed-to-be annexed area resulted in the City Council's action being arbitrary and made the annexation plan when considered in its entirety, unreasonable.

 Defendants suggest the sole purpose of the annexation "is for tax grab purposes." If this were the only purpose for the annexation it would, of course, be unreasonable and void. See, City of Sugar Creek, Mo. v. Standard Oil Company, 8 Cir., 163 F.2d 320. However, the evidence amply refutes such a contention.

Defendants' final contention is that the City of Fulton did not prove it has the ability to furnish its normal municipal services to the unincorporated area within a reasonable time. We do not agree with this contention. As we view the evidence it established Fulton's ability to furnish its police, fire, health, water and other normal municipal services to that area within a reasonable time. It is already providing some of them, such as electricity, and to some extent, fire and police protection. It plans on improving those services and providing its other services. The evidence indicates the city's financial structure is sound. To all appearances it can comply with and plans to comply with its duty to the to-be-annexed area.

 In conclusion, we find that the City of Fulton sustained its burden of proof that the proposed annexation was reasonable and necessary to its proper development and that it has the ability to furnish its normal municipal services to the proposed-to-be incorporated area within a reasonable time after the annexation is to become effective.

The judgment of the circuit court is affirmed. It is so ordered.

All concur.