CITY OF HOUSTON, a municipal corporation, Plaintiff-Respondent,

v.

W. E. DUFF, Herbert Coats, James Tweed, Ray Lilly, Jack Fogg, Fred Sillyman, Nolan Hutcheson, C. O. Bennett, Coy Haggard, Glen Romines, Elmer Frederick, John Hill, Charles Manier, Walter Redmon, Herman Head, George Harmon, E. E. Crawford, Ed Nichols, Emma Baker, Earl Sawyer and A. J. Haney, Defendants-Appellants.

No. 7843.

Springfield Court of Appeals.

Missouri.

Sept. 13, 1960.

Wm. Duke Hiett, Houston, for defendants-appellants.

Lay & Ichord, Houston, for plaintiff-respondent.

STONE, Presiding Judge.

This is an action by the City of Houston, Missouri, under the so-called Sawyer Act [V.A.M.S. 71.015; Laws of 1953, p. 309] for a declaratory judgment authorizing it to annex four contiguous tracts (hereinafter referred to as the contiguous tracts) having an aggregate area of 487.69 acres. Its pleaded theory is that the proposed annexation "is reasonable and necessary, because of the city's need of additional land for residential and industrial building sites and general police power and regulations, for the proper development of said city." Following trial, the circuit court entered the judgment sought by the city. Eight defendants, landowners in the contiguous tracts, have perfected this appeal.

■ As is usually the case in proceedings of this character, the evidence took a wide range and the transcript is exceedingly long. In the discharge of our appellate function to review the case de novo and to reach our own conclusions with respect to the law and the facts, weighing and evaluating all competent evidence with due deference to the findings of the trial court where the credibility of witnesses is involved [V.A.M.R. Civil Rules 87.11 and 73.01(d), formerly V.A.M.S. 527.070 and 510.310; City of Fulton v. Dawson, Mo. App., 325 S.W.2d 505, 516(1)], we have read and reread the entire transcript, have sifted and resifted the whole record, and have pondered and repondered the facts. But, since we could not detail all of the evidence within the tolerable limits of an appellate opinion, we perforce restrict ourselves to summarization of those facts which, in our considered judgment, are material, persuasive and controlling.

■ Houston, a city of the fourth class incorporated in 1893 and the county seat of Texas County, is a proud, prosperous, progressive community nestling in beautiful but rough Ozark hill country. Contrary to the experience of many communities in rural sections, Houston has had a steady increase in population, as reflected by census figures of 612 in 1930, 820 in 1940, 1,277 in 1950, and 1,657 in 1960.[1] Mayor Hill pointed out that some twelve homes were being constructed at the time of trial and about thirty residences had been built during the preceding year, and the city clerk said that, during the period of about seven years from municipal acquisition of the electric distribution system in July 1952 to the time of trial, 169 residential users and 30 commercial users had been added to the electric distribution system, with 40 of those residential users and 8 of those commercial users having been added "in the last year."[2] But, although the city's rate of growth during the immediate past is an important factor in proceedings of this character [cf. Faris v. City of Caruthersville, Mo.App., 301 S.W.2d 63, 69(10)], it is not, on the record before us, determinative.

■ The city produced only four witnesses whose testimony purported to go directly to the pleaded issue, i. e., whether the

1. The 1960 preliminary census figure of 1,657 was not available at the time of trial, but counsel have invited us to consider it.

2. Whether these figures reflect *net* additions (i. e., the number of customers connected less those disconnected) or *gross* additions (i. e., the number of users connected without deduction of those disconnected) is not stated.

city needs additional land for building sites. These witnesses were (1) Mayor Hill who has been "in the real estate business as a profession" for about twenty years, (2) Columbus Tuttle, a member of the Board of Aldermen who has been in the "building business" about twenty-five years, (3) Everett Austell, who does "a little building and a little loaning" and is an associate of Alderman Tuttle, and (4) Lee Holt who has been "building homes" since 1948. Careful analysis of the testimony of these witnesses demonstrates that the burden of their testimonial message was that the city needs additional land for building sites because (a) most of the unplatted land within the present boundaries of the city is not for sale and (b) "cheap priced lots" in the platted additions are relatively scarce. Illustrative of the testimony offered by the city in support of these contentions is the following:

(a) Mayor Hill said that "some of these lots" in platted additions within the city "are expensive lots" for homes costing $12,000 to $15,000. "I have a lot of calls for cheaper lots"—"we are * in need of lots where they can build cheaper homes and * I don't have them for sale myself"—"I don't know of any reasonable, cheap priced lots to any extent, at this time." With respect to an unplatted 40-acre tract owned by Ralph Lilly in the southwest corner of the city, which is "in timber and woods" and has no building on it, Mayor Hill tersely commented that "it is not for sale, according to my information," without disclosing when, where or from whom such "information" was obtained.

(b) The kernel of Alderman Tuttle's testimony was that, although he knew "four or five" people in Houston who had building lots for sale, "they're getting scarcer all the time, pretty hard to come by, reasonable priced lots that is." When, in the course of cross-examination with respect to various tracts within the city, inquiry was made concerning an unplatted 10-acre tract owned by John Baker in the south central part of Houston, Alderman Tuttle said that "I tried to buy from him, as a matter of fact," without indicating when, at what price, or under what circumstances.

(c) The question propounded to witness Austell as to "whether or not Houston is in need of additional building lots" elicited the prefatory comment that "it depends on what type of building we're building," followed by the statement that there are lots available for better homes "but the type of home that we're trying to build and hold them around seven to eight thousand dollars, why the lots of that type is getting, I'd say, practically immune." Austell readily conceded that "about the only thing we've looked at, been interested in, is something that had already been developed to a certain extent."

(d) Witness Holt thought that residential building lots in Houston are "a little scarce"—"I don't know of very many of the kind I'd wanna buy to build the homes that I build" to sell for $5,000 to $7,000. Holt "recently" purchased about 9 acres in one of the contiguous tracts (referred to as Tract 1). His testimony, altogether silent on the subject, leaves us in the dark as to what he has built or intends to build on this 9-acre tract, but we find a not-too-positive statement by Mayor Hill that "I believe there is a house or two started over there."

On the record presented, we are convinced that there has been and still is much room for growth within the present boundaries of the city which, since the last annexation in 1926, have encompassed an area of 740 acres. The city clerk frankly conceded that "there are just lots of vacant lots and large tract areas of land all over the City of Houston that have no residential dwelling or business buildings on (them)"; Alderman Tuttle readily agreed that, within the present city limits, "there's * * * lots a room for development"; and a map (hereinafter referred to as the map) prepared by a civil engineer then in the city's employ, which reflects and locates every dwelling and business building in the city, shows that more than 300 acres within the present boundaries of Houston are unplatted and undeveloped.

More specifically, we note the following evidence as to building sites in certain platted subdivisions within the city. A "reasonably level" tract of 30 acres in the northwest corner of the city was platted in June 1958 as *King-Wells Addition*. Of the 82 lots in this addition priced at $1,000 to $1,200 per lot, none had been sold at the time of trial one year later. Two blocks containing an aggregate of 24 lots, none smaller than 80 feet by 140 feet, were platted in June 1958 as *Sunset Terrace Addition*, sometimes referred to as Howerton's Addition. Mayor Hill thought that Howerton "possibly has 15 lots" for sale. The map shows only 2 houses in this addition, leaving 22 vacant lots. The only reference to the market price of these lots was Mayor Hill's observation that "they're reasonably high." A tract in the south part of the city was platted in May 1957 as *Lilly-View Addition*. In this addition containing 66 lots available at an "average" price of $800 per lot, the map shows only two houses, but Alderman Tuttle thought that there were "about four (houses) in there" at the time of trial. Witness Austell considered the lots in this addition "not too desirable"—"brush is still on them." However, on cross-examination Alderman Tuttle referred to Lilly-View as a "very nice addition." *Hill's Addition* containing 120 lots with a frontage of 25 feet each (the equivalent of 60 lots with a frontage of 50 feet each) in the northwest part of Houston was platted in November 1921. From the map it appears that 13 houses have been built in this addition. The only evidence bearing upon the value of lots in this addition was that many of them "sold for taxes * just a few years ago." *Orchard Grove Addition* containing 63 lots, each 50 feet by 190 feet, was platted in October 1907. In this addition, there are but five houses, of which only one has been built within the past ten years. Witness Austell did not know that Orchard Grove was a platted addition—"I thought it was a cow pasture."

Alderman Tuttle doubted whether lots in this addition had been for sale "all this time," but he readily admitted knowledge that the owner of 26 lots had tried "to sell them for several months" during the year prior to trial. There was no evidence of the market price of lots in this addition.

Thus, in the *five subdivisions* discussed, there are the equivalent of 271 vacant lots, none less than 50 feet in width; and, as is usually true, there are scattered throughout other subdivisions in the city many vacant lots ranging from one end of the scale to the other in desirability and availability. Because of brush and timber, some *unplatted tracts* in the city are not presently usable as building sites, although it is not, and could not well be, contended that those tracts are *not suitable for development* as residential subdivisions simply because of the brush and timber on them. Other unplatted tracts are not desirable for residential building because of their topography. No witness even offered an opinion as to the unplatted acreage within the city which would or would not be suitable for residential subdivision, but the over-all picture, as we get it from the transcript, is that at least a substantial, if not the major, portion of the unplatted tracts having an aggregate area of more than 300 acres would be usable for building sites *if* the present owners desired to prepare the land for such usage or were willing to sell at prices attractive to builders or realtors.

As stated at the outset, the city proposes to annex four tracts. The area identified as *Tract 1* contains 202.39 acres, adjoins the northeast corner of the city, and is highly irregular in outline with two pudgy fingers reaching out from the present boundary, one in an easterly direction along Highway 63 and the other in a northeasterly direction along farm-to-market Highway "O". It appears that Tract 1 contains 31 houses and about 105 residents.[3] The area identified as *Tract*

3. We find no *direct* statement as to the number of dwellings in each tract, but this information was furnished indirectly by the testimony of the city clerk as to the number of houses in each tract connected to the municipal water system and

*2* contains 15.15 acres, adjoins the east side of the city, is rectangular in outline, and contains only one house occupied by one family apparently comprised of 6 persons. The area identified as *Tract 3* contains 143.-22 acres, lies along the west boundary of the city, is irregular in outline, and contains 6 houses and about 23 residents. The area identified as *Tract 4* contains 126.93 acres, adjoins the south side of the city, and is irregular in outline with the major portion of the acreage included in a pudgy finger extending southward along Highway 63 but with a thin strip running in an easterly direction to Highway 17 and angling southeastwardly along one side of that road. Tract 4 contains 22 houses and the only population estimate in the transcript is "about 23." Thus, the four tracts contain in the aggregate 487.69 acres, about 60 houses, and approximately 157 persons (the sum total of the foregoing population estimates by Mayor Hill) to 180 persons (Mayor Hill's subsequent aggregate population estimate). As a relevant and material, although not in and of itself controlling, factual facet of the situation here presented, we note that the average population density of 2.24 persons per acre *within the present boundaries* of Houston (i. e., the acreage of 740 divided by the 1960 census figure of 1,657 persons) is, with a single exception,[4] *substantially lower* than in any reported case in which annexation has been approved and the acreage and population figures have been recorded in the opinion,[5] and that similarly the average population density of .32 to .37 person per acre *within the contiguous tracts* (i. e., the aggregate acreage of 487.69 divided by the population estimates of 157 and 180 persons) is, without exception, *substantially lower* than in any such prior reported case.[6]

Where, as the city here insists, there is an urgent need for additional building sites, the population of the city usually has spilled over its boundaries, and the need has manifested itself by the construction

the number of houses not so connected. The population estimates are those of Mayor Hill.

4. In Dressel v. City of Crestwood, Mo. App., 257 S.W.2d 236, 238, 241, the average population density within the city was about 1.5 persons per acre (1,100 acres and 1,645 persons), but the reasonableness of annexation was supported by persuasive factors not here present, to-wit, a pressing need for common municipal control of both sides of H'ghway 66 and traffic thereon, and the existence of a municipal zoning ordinance and municipal plumbing, electrical and building codes whose uniform applicability would be beneficial both to the city and to the annexed area. Furthermore, the population density of .8 person per acre in the annexed area (1,100 acres and 871 persons) was more than double that in the instant case.

5. The average population density within the city before annexation was, in City of Fulton v. Dawson, Mo.App., 325 S.W. 2d 505, 508, approximately 5.8 persons per acre (1,720 acres and 10,000 persons); in City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 11, approximately 9.5 persons per acre (9,000 acres and 85,000 persons); in City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546, 548, approximately 12 persons per acre (1,-000 acres and 12,000 persons); in State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 386, 228 S.W.2d 762, 766, approximately 11.3 persons per acre (39,936 acres and 450,000 persons); and in State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 1202, 62 S.W.2d 393, 397, approximately 3.32 persons per acre (9,000 acres and 29,902 persons).

6. The average population density in the annexed area was, in the St. Joseph case, supra, 312 S.W.2d loc. cit. 13, approximately .8 person per acre (8,741 acres and 6,800 persons); in the St. Ann case, supra, 299 S.W.2d loc. cit. 550, approximately 2.67 persons per acre (750 acres and 2,000 persons); in the Crestwood case, supra, 257 S.W.2d loc. cit. 241, approximately .8 person per acre (1,100 acres and 871 persons); and in the North Kansas City case, supra, 228 S.W.2d loc. cit. 766–767, approximately .85 person per acre (11,140 acres and 9,460 persons). In the Joplin case, supra, 62 S.W. 2d loc. cit. 399, there was an "average (of) less than 2 acres per house" in one of the annexed tracts, and in Winter v. City of Kirkwood, Mo.App., 296 S.W. 232, 233, the average was 3.6 acres per house (758 acres and 212 houses), as contrasted with an average of 8.1 acres per house in the instant case (487.69 acres and 60 houses).

of a substantial number of new homes in adjoining areas and by the platting and development of new subdivisions in those areas. No such situation is reflected by the instant record. Mayor Hill estimated that, in the *ten years* prior to trial, "possibly only two or three" new dwellings had been constructed in the Highway 63 prong of Tract 1 (there was no evidence as to construction in the Highway "O" prong of Tract 1), none had been constructed in Tract 2, two houses had been constructed in Tract 3, "possibly one" had been constructed in the Highway 17 prong of Tract 4, and "possibly five" had been constructed in the Highway 63 prong of Tract 4. So it appears that, in the aggregate area of 487.69 acres sought to be annexed, only some ten or eleven houses have been constructed during the past ten years, or an average of about one new house each year.[7] In most of the reported cases approving annexations the opinions have recited, and in some instances have emphasized, that a substantial portion of the annexed territory had been subdivided or was being held for subdivision.[8] In the case at bar, the city's statement of facts contains the assertion that "part (of the contiguous tracts) has been platted for several years" and the argument contains a similar averment that "some of the land is platted." Neither statement is supported by a specific page reference to the transcript, as is required by V.A.M.R. Civil Rule 83.05(d) [formerly Supreme Court Rule 1.08(c) ]; and, in a meticulous search through the transcript, we find no evidence that any part of the contiguous tracts is either subdivided or being held for subdivision.

With the city's case geared to the alleged need for "cheap priced" lots, the record is strangely and perhaps significantly silent as to the market value of land in any of the contiguous tracts and as to how "cheaper priced" building sites might be provided in those tracts under the settled policy of the city, as stated by Mayor Hill, not to "put anything in * to begin with" but to "make the property owner * do that," i. e., to require the landowner to open streets in, and to make utility services available to, a new subdivision at his own expense. Apparently in an effort to justify annexation on another and unpleaded theory, the city recites in its statement of facts that "the value of the land (in the contiguous tracts) is enhanced by at least 100% *by reason of its adaptability for prospective city use.*" (All emphasis herein is ours.) At the cited transcript page, Mayor Hill testified, in response to the inquiry "what is it that determines the value of that land at the present time," that "the City of Houston would be * the cause of it to have a good valuable price on it—if the City of Houston wasn't here, it wouldn't be worth half what it is *without the city being that close to it.*" But, in the landmark case of State ex inf. Major v. Kansas City, 233 Mo. 162, 214, 134 S.W. 1007, 1022, our Supreme Court, en banc, immediately after stating that one of the circumstances supporting reasonable extension to take in contiguous lands is "when they are valuable *by reason of their adaptability for prospective town uses,*" sounded the caveat that "the mere fact that their value is enhanced by reason of their nearness to the corporation would not give ground for their annexation, *if it*

---

7. Contrast the St. Joseph case, supra, 312 S.W.2d loc. cit. 13, where 272 new residences in the annexed area had been built in a period of four years, and the St. Ann case, supra, 299 S.W.2d loc. cit. 550, where the annexed area contained 541 completed homes and "(n)umerous others are under construction."

8. See the Fulton case, supra, 325 S.W. 2d loc. cit. 512; the St. Joseph case, supra, 312 S.W.2d loc. cit. 13; Williams v. City of Illmo, Mo.App., 279 S.W.2d

196 (disapproving the annexation of Tract I, 183 acres of unplatted land, and approving the annexation of Tract II, 10 acres platted as "Hillemans Second Addition"); the North Kansas City case, supra, 228 S.W.2d loc. cit. 767, 776–777; Seifert v. City of Poplar Bluff, Mo.App., 112 S.W.2d 93, 97–98; Algonquin Golf Club v. City of Glendale, 230 Mo.App. 951, 81 S.W.2d 354, 355, 357; Bingle v. City of Richmond Heights, Mo.App., 68 S.W.2d 866, 868; the Kirkwood case, supra, 296 S.W. loc. cit. 233.

*did not appear that such value was enhanced on account of their adaptability to town use."* [9] Again, we search in vain for any such evidence. The proposed annexation cannot be supported on the theory (whether pleaded or not) of enhanced value of the contiguous tracts by reason of their adaptability for prospective town uses.

■ Other factors properly for consideration in determining the reasonableness of a proposed annexation were stated in the Kansas City case, supra, 233 Mo. loc. cit. 213–214, 134 S.W. loc. cit. 1022, and have been reiterated many times.[10] Without again detailing those factors here, we may say that, in studying the record before us, we have kept in mind all of them as well as additional factual elements recognized in the reported cases [11] as relevant, to-wit, (1) the need for or the beneficial effect of uniform application and enforcement of a municipal zoning ordinance in the city and in the annexed area, (2) the need for or the beneficial effect of uniform application and enforcement of municipal building, plumbing and electrical codes, (3) the need for or the beneficial effect of extending police protection to the annexed area, (4) the need for or the beneficial effect of uniform application and enforcement of municipal ordinances or regulations pertaining to health, and (5) the fact that the annexation under review would make the boundaries of the city more regular. None of the stated factual elements are inherent in the instant case. There is no showing that Houston has a zoning ordinance or a building, plumbing or electrical code. The municipal police department consists, as Mayor Hill tells us, of "an elected city marshal, * * a night marshal who is appointed or hired by the council, and * * a city police car," but there is not a breath of evidence indicating a need in the contiguous tracts for protection, regulation or intervention by city officers. Compare Stoltman v. City of Clayton, 205 Mo.App. 568, 226 S.W. 315, 321, and contrast Rogers v. City of Deepwater, 240 Mo.App. 795, 219 S.W.2d 750, 756. In this connection, we record the pertinent fact that there are no roadside taverns, amusement clubs or dance halls in the contiguous tracts, and that the only businesses therein, three in number and all in Tract 1, are a drive-in theater, a grocery and a filling station.

Houston has no health department or health commissioner, and the only local agency dealing with problems in this field is a "health committee" composed, as Mayor Hill says, "of one doctor and the Mayor and, so far as I know, one of the council members." The record does not disclose whether this "health committee" has any official standing or authority, but presumably it handles such matters as complaints arising from the maintenance and use of privies or

9. By approved quotation, the same statement appears in the Illmo case, supra, 279 S.W.2d loc. cit. 203; Ozier v. City of Sheldon, Mo.App., 218 S.W.2d 133, 137; the Poplar Bluff case, supra, 112 S.W.2d loc. cit. 97; and the Richmond Heights case, supra, 68 S.W.2d loc. cit. 867.

10. See the *Fulton* case, supra, 325 S.W.2d loc. cit. 516–517; the St.Ann case, supra, 299 S.W.2d loc. cit. 551; the Illmo case, supra, 279 S.W.2d loc. cit. 202–203; Johnson v. Parkville, Mo.App., 269 S.W.2d 775, 777–778; the Crestwood case, supra, 257 S.W.2d loc. cit. 248; Arbyrd Compress Co. v. City of Arbyrd, Mo.App., 246 S.W.2d 104, 111–112; the North Kansas City case, supra, 228 S.W.2d loc. cit. 774; the Sheldon case, supra, 218 S.W.2d loc. cit. 137; Jones v. City of Ferguson, Mo.App., 164 S.W.2d 112, 118;

the Poplar Bluff case, supra, 112 S.W.2d loc. cit. 96–97; Central Missouri Oil Co. v. City of St. James, 232 Mo.App. 142, 111 S.W.2d 215, 221; the Glendale case, supra, 81 S.W.2d loc. cit. 358; the Richmond Heights case, supra, 68 S.W.2d loc. cit. 867; Jones v. City of Clayton, Mo.App., 7 S.W.2d 1022, 1024; Stoltman v. City of Clayton, 205 Mo.App. 568, 226 S.W. 315, 320.

11. E.g., the *Fulton* case, supra, 325 S.W.2d loc. cit. 509–512, 515; the St. Joseph case, supra, 312 S.W.2d loc. cit. 17; the St. Ann case, supra, 299 S.W.2d loc. cit. 549, 552; Waller v. City of Macon, Mo.App., 277 S.W.2d 886, 894–895; the Crestwood case, supra, 257 S.W.2d loc. cit. 245, 247, 249; the Poplar Bluff case, supra, 112 S.W.2d loc. cit. 99; the Glendale case, supra, 81 S.W.2d loc. cit. 356–357.

backhouses [in elegant or formal society sometimes referred to as cabinets d'aisance (Ritchie v. Burton, Mo.App., 292 S.W.2d 599, 603)] and complaints lodged by neighbors when, as the city superintendent of water, streets and sewers put it, a septic tank is "not a-working," apparently a chronically exasperating condition at one point on what formerly was dignified as Fashionable Street but now is more prosaically called Hawthorne Street where the city superintendent readily acknowledged "it's tried to be whipped several times." But, whatever the problems in the city with which the "health committee" has wrestled, there is no suggestion of any situation in the contiguous tracts calling for attention by this "committee." We note parenthetically that, although a municipal sewer system was constructed in 1947, the city's evidence shows that, of 625 water users in Houston, more than forty per cent (to be exact, 254) are without sewer service, many because of the topography which makes it impossible to connect large areas inside the city without construction and maintenance of relatively expensive lift stations. For the same reason, none of the homes in the contiguous tracts could be connected to the sewer system at this time, with the sole exception of homes in the Highway "O" prong of Tract 1.

A declaratory judgment under the Sawyer Act [V.A.M.S. 71.015; Laws of 1953, p. 309] must rest upon facts showing "(t)he area to be annexed," "(t)hat such annexation is reasonable and necessary to the proper development of said city," and "(t)he ability of said city to furnish normal municipal services of said city to said unincorporated area within a reasonable time after said annexation is to become effective." *Assuming arguendo* in the instant case that the city's evidence establishes the last quoted prerequisite, i. e., its ability to furnish normal municipal services to the contiguous tracts within a reasonable time (although at least with respect to extension of sewer service this is, we think, highly doubtful if not quite improbable), it becomes unneces-

sary for us to detail or digest the voluminous evidence directed to this subject. In addition to what has been recited, it will suffice to say that residents in the contiguous tracts receive electric service from Inter County Electric Cooperative on a slightly higher rate schedule than that on which the city furnishes electric service from its municipal distribution system (both Inter County and the city having the same wholesale power source and supplier), and that practically all of the homes in the contiguous tracts already receive water service from the municipal water system pursuant to "agreements" under which such users extended and laid lines from the city limits at their own expense and are furnished water on "the city rate" plus "an extra charge of 75¢" per month.

■ In our view of the case, the determinative question is whether the proposed "annexation is reasonable and necessary to the proper development of (the) city." In a scholarly opinion just handed down in City of Olivette v. Graeler et al., Mo.Sup., 338 S.W.2d 827, a suit for a declaratory judgment under the Sawyer Act, our Supreme Court (per Storckman, J.) has stated plainly and forthrightly (and, as we believe, altogether properly and correctly) that the quoted statutory provision "embodies two separate but closely related concepts," to-wit, "(a) that the annexation is reasonable, and (b) that the annexation is necessary to the proper development of the city"; that these "issues of reasonableness and necessity as well as the other fact questions in a Sawyer Act case should be determined in the same manner that such issues are decided in other actions"; and, that the burden of pleading and proving the statutory prerequisites rests upon the city. Furthermore, the Olivette case, supra, appropriately points out that "(t)he reasonableness of an annexation by a city has always been held to be a subject of judicial inquiry largely because the inhabitants of the adjacent territory have no part in the selection of the city officers who initiate the annexation proceeding nor a vote in the city elec-

tion by which 'it is confirmed," and that "both parties," i. e., both the city and residents of the area sought to be annexed, "are entitled to the test of reasonableness." Thus, even prior to the Sawyer Act, our courts have, on several occasions, thought it proper to state that a municipality should not be permitted to extend its tax dragnet indiscriminately by annexing large areas to which no substantial reciprocal benefits would accrue.[12]

■ True, the "aids or guides developed by the cases before the Sawyer Act are still helpful in arriving at a decision of the ultimate fact questions specified" in the statute [the Olivette case, supra]; and, as prior to the Sawyer Act [the Caruthersville case, supra, 301 S.W.2d loc. cit. 69], a municipality should not be prohibited from making *reasonable* provision for the foreseeable future [City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 18] nor foreclosed from expansion solely because it still may have undeveloped tracts and vacant lots 'within its present boundaries. City of Fulton v. Dawson, Mo.App., 325 S.W.2d 505, 517. But, city officials no longer may rely upon a strong current of presumptive reasonableness and validity [which ran in earlier cases (e. g., the Caruthersville case, supra, 301 S.W.2d loc. cit. 68)] to carry them into the haven of a favorable judgment. It is natural for one to exalt the place of his nativity or abode, even as the apostle Paul, in seeking permission from the chief captain to address the angry mob threatening his life, proudly identified himself as a "Jew of Tarsus, * * a citizen of no mean city." Acts 21:39. But, commendable as is civic pride (not to be confused with uncontrolla-

ble compulsion for, stubborn attachment to, or abject adulation of a city, which are hallmarks of frailty), dreams or hopes thereby inspired are not a sound and sufficient substitute for evidence in a legal action.

■ In no other class of suits is it settled more firmly or with better reason that each case must stand on its own facts.[13] Yet, mindful that the issues of reasonableness and necessity may not be resolved by any hard and fast rule or formula and that no single factor is a legal absolute in the sense that it is conclusive on those issues [the Caruthersville case, supra, 301 S.W.2d loc. cit. 70], and recognizing that we should not approach the city's claim of territorial need with a narrow or restricted perspective [the Kansas City case, supra, 233 Mo. loc. cit. 227, 134 S.W. loc. cit. 1026], we have scrutinized the facts of the instant case in the light of all of the auxiliary guides suggested in prior annexation cases. Without resifting the facts and undertaking to winnow out the chaff, we announce the conclusion, to us inescapable, that the city clearly has failed to show that the proposed annexation is either (a) reasonable or (b) necessary to proper development of · the city.

Accordingly, the judgment of the circuit court is set aside and the cause is remanded with directions to enter a judgment dismissing plaintiff's petition with prejudice as of July 20, 1959, the date of the original judgment.

RUARK, J., concurs.

McDOWELL, J., not sitting.

12. The Illmo. case, supra, 279 S.W.2d loc. cit. 204; the Arbyrd case, supra, 246 S.W.2d loc. cit. 113; the Sheldon case, supra, 218 S.W.2d loc. cit. 138; the Ferguson case, supra, 164 S.W.2d loc. cit. 119–120; Boals v. Garden City, Mo. App., 50 S.W.2d 179, 182; the Clayton case, supra, 7 S.W.2d loc. cit. 1024; Missouri Zinc Fields Co. v. Webb City, 215 Mo.App. 39, 242 S.W. 1008. See also State ex inf. Major v. Kansas City, 233 Mo. 162, 217–218, 134 S.W. 1007, 1023, and 62 C.J.S. Municipal Corporations § 44, loc. cit. 129.

13. City of Olivette v. Graeler, Mo.Sup., 338 S.W.2d 827; the Parkville case, supra, 269 S.W.2d loc. cit. 778; the North Kansas City case, supra, 360 Mo. loc. cit. 401, 228 S.W.2d loc. cit. 777; the Kansas City case, supra, 233 Mo. loc. cit. 213, 134 S.W. loc. cit. 1022.