**The CITY OF AURORA, Missouri, a municipal corporation, Plaintiff-Respondent,**

v.

**The EMPIRE DISTRICT ELECTRIC COMPANY et al., Defendants-Appellants.**

No. 7943.

Springfield Court of Appeals.

Missouri.

Feb. 14, 1962.

Edward V. Sweeney, Monett, Emory Melton, Cassville, for appellants.

Ratican & Faulkner, William A. Ratican, Jr., Aurora, for respondent.

RUARK, Presiding Judge.

This is an appeal by the defendants from a judgment rendered in favor of the plain-

tiff, City of Aurora, authorizing the annexation of certain lands under the Sawyer Act (Section 71.015, V.A.M.S., Laws of 1953, p. 309).

The petition describes the lands by metes and bounds. The charging portion is:

"3. That the above described real property is contiguous with the present corporate limits of said City, and the area is now unincorporated; that the population of the City is increasing and many new homes and business buildings .have been, and are being built in said City; that virtually all of the area within the present corporate limits of said City has been utilized for construction of new homes and industrial plants; that unless the within described area is annexed to said City the growth and development of the City of Aurora, Missouri will be restricted and retarded; and that it is necessary and reasonable that the said area be so annexed to said City."

The petition states that the areas sought to be annexed are so situate that they are now being or will be developed as city property which will satisfy such need for additional sites for residence and industry; that the city can furnish normal municipal services, et cetera.

Defendants' motion to dismiss having been overruled, they filed answer, in effect a denial of each fact, and the cause was tried on the issues thus presented.

■ Such issues must be presented and determined in the same manner as in other actions. City of Olivette v. Graeler, Mo., 338 S.W.2d 827, 837. And under the general rules of pleading and practice the plaintiff is held to the theory which he specifically selects and presents as his

ground for recovery.[1] In the determination of such issues the plaintiff city has (since the Sawyer Act) the procedural burden. It must make a prima facie case in favor of its legislative ordinance. City of St. Joseph v. Hankinson, Mo., 312 S.W. 2d 4, 10; City of Olivette v. Graeler, supra, 338 S.W.2d 827; City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546; City of Creve Coeur v. Patterson, Mo.App., 313 S.W.2d 739.

■ The question of whether city boundaries shall be extended is a legislative function delegated to the governing body of the city. This function can in nowise be exercised by the courts. The scope of our review, and indeed the limit of our jurisdiction, is to determine whether or not the legislative act of the city council was arbitrary and unreasonable or in excess of the power granted by the statute. If it be found that the reasonableness is "fairly debatable," that ends the question in so far as the courts are concerned. It is then for the electorate.[2] In determining this question the courts have devised and attempted to follow certain positive and negative guides. We will not repeat them in detail here. They are enumerated in most of the decisions. See State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S.W. 1007; City of Houston v. Duff, Mo. App., 338 S.W.2d 373; see generally Washington University Law Quarterly, April 1961, p. 159. We might add that other factors to be considered, not regularly so listed but referred to on more than one occasion, are a comparison of the relative benefit or detriment, in other words, fairness to the citizens of the annexed territory who have no voice in the proceedings for annexation (City of Woodson Terrace v. Herklotz, Mo.App., 349 S.W.2d 446, 451; see Jones v. City of Ferguson, Mo.App., 164 S.W.2d 112, 119–120; Ozier v. City of

1. Ritchie v. Burton, Mo.App., 292 S.W. 2d 599; Schroeder v. Johnson, Mo.App., 218 S.W.2d 982; Faught v. St. Louis-San Francisco Railway Co., Mo., 325 S.W.2d 776.

2. City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4; City of Lexington v. Shepard, Mo.App., 344 S.W.2d 308; City of Fulton v. Dawson, Mo.App., 325 S.W. 2d 505.

Sheldon, Mo.App., 218 S.W.2d 133; Boals v. Garden City, Mo.App., 50 S.W.2d 179; Missouri Zinc Fields Co. v. Webb City, 215 Mo.App. 39, 242 S.W. 1008), and the needs of the area for municipal services. City of Olivette v. Graeler, supra, 338 S.W.2d 827, 838. Also sometimes attention is paid to the fact of whether the annexation makes the boundaries of the city more regular or irregular.[3] All these rules or guides are to be considered, if the facts so justify, but they are only factors, no one of which is necessarily controlling, and those relevant are to be considered in relation to each other. Hence no fixed formula can be stated, and each case must stand on its own circumstances.[4]

In order to avoid tripping over our own rules and guides, we do well to hie back to the statute fixing the authority of the city. The Sawyer Act permits the annexation when (a) such annexation is *reasonable and necessary* to the proper development of the city and (b) the city is able to furnish its normal municipal services to the annexed area within a reasonable time. We find most of the discussions in the cases concern themselves with "reasonableness," this because we assume, as was stated in City of St. Joseph v. Hankinson, supra, 312 S.W.2d 4, 9, the "necessity" is a part of the "reasonableness," or at least they are "closely related concepts." City of Woodson Terrace v. Herklotz, supra, 349 S.W.2d 446, 448. This "necessity" of the city applies not only to the present but also to such future needs as are reasonably foreseeable and not too remote or speculative,[5] although "visionary" needs are too remote. Stoltman v. City of

Clayton, 205 Mo.App. 568, 226 S.W. 315, 321.

Historically and factually, Aurora is a well-balanced city of the third class. It has had a satisfactory but not a boom growth in recent years. Population figures are:

| | |
|---|---|
| 1930 | 3875 |
| 1940 | 4056 |
| 1950 | 4153 (or was it 4,053 or 4,059?) |
| 1960 | 4665 |

The city has the amount of industry satisfactory and normal to a city of its size. Most of such industry has been located in the city for at least fifteen years, although one of the principal industries has expanded its operations considerably within the past three years. There are, according to the secretary of the chamber of commerce, a total of 1450 persons engaged in industry, large and small. The city has a police department, a fire department, a street department, and a health officer. In addition there are two parks and a public library. Parks, library, and hospital are administered by separate boards. The parks and library seem to have a comfortable surplus on hand. The hospital is said to be self-supporting. The city does not own any utilities except its sewer and disposal system. Electricity and water are supplied by the Empire District Electric Company, and gas is supplied by the Gas Service Company. Both of these companies hold franchises with the city, and both of them also supply service to areas not within the city under the regulation of the Public Service Commission.

---

3. See Jones v. City of Ferguson, Mo.App., 164 S.W.2d 112, 117; Ozier v. City of Sheldon, Mo.App., 218 S.W.2d 133, 138; Boals v. Garden City, Mo.App., 50 S.W. 2d 179.

4. City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 18; City of St. Ann v. Buschard, Mo.App., 299 S.W.2d 546; Faris v. City of Caruthersville, Mo.App., 301 S.W.2d 63; City of Houston v. Duff,

Mo.App., 338 S.W.2d 373; Johnson v. City of Parkville, Mo.App., 269 S.W.2d 775.

5. City of Fulton v. Dawson, Mo.App., 325 S.W.2d 505, 517; Faris v. City of Caruthersville, Mo.App., 301 S.W.2d 63; Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860, 865; Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, 249.

The sewer and disposal system was recently secured by means of issuance of bonds in 1958 and 1959 (the total amount outstanding on March 31, 1960, was $443,000, being $245,000 in general obligation bonds and $198,000 in revenue bonds). A new 39-bed hospital was constructed by the issuance of bonds (in 1958). The amount outstanding March 31, 1960, was $213,500. Total bond obligations outstanding as of March 31, 1960, *including* amortized interest, were $1,091,525.03.

In 1958 the city passed a zoning ordinance, and in the two years following its passage the city clerk issued a total of 182 "building permits" over all. These include remodeling, repair, moving, and removal, but 91 of them are concerned with new buildings of various character.

The city lies in the shape of a rectangle with the northwest quarter cut out. Its area is 1460 acres. It is, or at least was, bisected east and west by U. S. Highway 60, but it appears that such highway is or was under study for, or in the process of, relocation. Of the area within the city limits, approximately ⅔ has been platted, and streets, alleys, lots, and blocks have been laid out. Part of this platted area has been zoned for industrial uses, but most of it is zoned B for residential purposes. Of the approximately ⅓ unplatted area within the city, about 180 acres are zoned residential B and most of the remainder is classified residential A. Requirements as to dimension and type of structure are higher in Zone A than in Zone B. Since the principal issue in this case is the contention that virtually all of the area within the city has been utilized for construction of homes and the growth of the city will be retarded unless the additional areas be annexed (in other words, that the city is bursting at its seams), a consideration of the whole area in regard to space within the city becomes most important.

In regard to the *platted portion* of the city, the evidence is "incredibly vague" (City of Creve Coeur v. Patterson, Mo.

App., 313 S.W.2d 739, 744) as to the number of vacant lots and blocks suitable and available for use. City councilman Hall testified:

"Q. Is there a need in the city for building lots?

"A. Yes, there is."

The manager of the Empire District testified there were "not too many" desirable building lots within the present city limits.

"Q. Is there a need for desirable building lots?

"A. Well, apparently so, because so many people are going outside the city limits to build a better type of house."

That is all the evidence we find as to residential space within the platted areas.

Of the *unplatted areas,* there are an approximately square tract of 160 acres lying in the northeast corner of the city and another 20 acres lying immediately south of the southeast quarter thereof, or a total of 180 acres, all zoned residential B. In former times Aurora sat on or partly on an old mining camp, and a part of this 180 acres (one of plaintiff's principal witnesses estimated 75%) is pitted with old sludge ponds, shafts, tailing piles, mill foundations, et cetera. Another of plaintiff's witnesses described it, or part of it, as looking like "the valleys of the moon." Parts of this portion have been used for "city dump" purposes. Some of the land is said to be swampy, and we think plaintiff has shown that it is not practicable, under present economic conditions, to develop the southeast quarter of that quarter-section, on the east city limits line, for residential purposes. There is conflict as to the suitability of the southwest 40 and the north half of the quarter-section (there appear to be people living along a perimeter street in the southwest 40 and to some extent in the north half), but, deferring to the trial judge in respect to credibility, we would conclude that most of this, although not to so great extent, is not practically suitable to development. As to

40 acres, approximately the northwest quarter, we cannot do so. Although the zoning map shows no platted streets in the whole 160 acres, except one running through the center, one of the plaintiff's principal witnesses testified that part of the 80 was suitable for development in the area of one, two, or "maybe three" streets immediately east of Elliott.[6] There appear to be houses along the perimeter street on the south of the east half of this quarter-section and partly along the highway which is the perimeter on the north. A defendants' witness who lives upon and owns approximately 15½ acres of the remainder of her husband's old farm there testified that this area (the northwest quarter of the area) was "suitable," but that she had been unable, after five years of endeavor with the city and with the water franchise holder, to have water brought to her area.

We believe the evidence shows that, given utilities, ¼ of this northeast 160, or 40 acres, is suitable for practical development in its present state.

We turn now to that portion of the city zoned as Class A residential. This consists of approximately 335 acres. Most of it is unplatted.

In the southeast corner is a square which apparently comprises 40 acres. There are no streets shown within this area and so far as the record shows there are no houses in this 40 except along the streets on the perimeter. The witnesses seem to agree that this land compares favorably for residential purposes with the platted portion of the city. Crossing to the west, across a half-mile of platted territory, we come to approximately 120 acres, or three 40-acre tracts, lying in an east-west direction. The first or easternmost 40 is approximately the same type of land as the platted portion of the city and "lays relatively well." On the zoning plat are shown streets on the south and east perimeters, but none otherwise.

We do not find any development of this tract, unless we include some five or six houses in a subdivision on the north side (probably in the adjoining 40 to the north and facing a street in the platted portion of the city). The school has purchased a tract apparently somewhere within this 40, but where or how much acreage is not shown.

The 80 acres lying immediately west of the last-mentioned 40 and extending to the southwest corner is also zoned A. It has streets on the perimeters as shown on the plat, but nothing in between. Most of this land seems to be of the same general character as the other land lying along and inside the south line of the city, except that this west 80 is bisected through the center, north and south, by some kind of branch or watercourse (whether occasional or continuous we do not know) and "there are some low places." Putting all the evidence together, and giving plaintiff the benefit of doubt where it appears, it would seem that approximately 75% of this 80, or (reduced to proportions) 60 acres, is suitable for development, provided it had streets and utilities. Since the filing of this suit a small development has been commenced in the extreme southwest corner of this tract where there is access to a road on the west and a street on the north. Lots have been platted and are for sale.

To sum up the tier of forties inside the extreme south boundary, one could start walking at the center of the extreme west side and go for approximately three-quarters of a mile without crossing a yard or encountering a building. Then for approximately a half-mile he would travel across platted and, presumably, developed areas, and finally he would traverse approximately another quarter-mile of undeveloped land to reach the east side of the city.

On the west side of the city and due north of the westernmost 80 last mentioned, there lies a tract extending about a quarter-mile

6. The platting plan of the city follows generally three blocks square, or nine square blocks to the 40 acres.

north and south, zoned A except for approximately 20 acres on the extreme west owned by a shoe company and zoned industrial. The zoning map indicates that 20 acres are platted and have been laid out in lots, and this subdivision is fairly well built up. The rest of that 80 acres is very "sparsely" occupied and mainly undeveloped. We find only one impediment to development, a drainage ditch approximately 12 feet wide and 5 feet deep extending across 8 acres. We would estimate that there are about 40 acres of this which could be developed and used for residential purposes if streets and all utilities were available. North of that is a tract extending (not quite) ½ mile north and south and varying in distance from ¼ mile to ⅛ mile in width. This unplatted area appears to be not more than one-half developed, and, discounting park and public school areas, it would seem that there are at least 20 acres suitable for such purpose.

In the northeast corner of the city is another 40 acres also zoned A residential. Five acres of it have been platted and partially built upon. As to the lay of the land, it appears to be suitable for development, but a witness for the city considered it undesirable because of the kind of houses which have been built upon it.

One other tract of approximately 40 acres just inside the east city limit line is zoned A. This area is part of the old mine field, containing old mine holes, slag ponds, and waste piles. Chatt Creek, although not a perpetually running stream, runs through it, and the area is at least to some extent swampy. According to plaintiff's witnesses, only a portion along one side of this 40 is suitable for development.

We conclude that, exclusive of whatever the situation may be in the platted area, there are within the present city limits 230 acres or more, in blocks of not less than 20 acres (and the majority of them 40 acres), which have been zoned A residential and, if given streets and utilities, are suitable and practicable for use as city lots but have little or no development or residential use at the present time. Pictorial evidence indicates at least a goodly portion of this land is very slightly rolling and, with a normal or less than normal amount of landscaping, is highly desirable if developed for residential purposes. We find that there are at least 40 acres of unplatted land zoned B residential within the city which have little or no development and could, given proper streets and utilities, reasonably be used for the purposes for which it is zoned. There are at least another 40 acres of Zone B property which could be developed for residential purposes with some grading and leveling. On the whole, there are at least 270 practically vacant acres of unplatted land within the city which require only normal development for residential purposes.

As to needs for industrial purposes, the city exhibit shows various areas zoned for that purpose, one of which runs east-west through the center of the city. Without attempting to discuss this in detail, we may say it appears the city has industrial area to spare. There is a strip extending north of State Highway 39 and south of the Frisco Railroad for almost a half-mile into the center of the city which has practically no use. There is an area along the railroad in the north part of town which appears to comprise about 40 acres and is completely unoccupied. Twelve acres of this land are owned by a local public-spirited industrial development corporation, but so far no new industry has been induced to make use of it. Some of the industrially zoned land in the central-eastern portion of the city seems to be only sparsely occupied. The easternmost 40 acres of industrially zoned land lies between the lands zoned A and B which we have said are not practical for development for residential purposes, and we would assume that the same would apply to this tract in respect to industrial purposes, although the land appears to have been filled or partly filled along the bisecting railroad tracks.

There is no evidence of difficulty in obtaining new industries or expanding old ones because of lack of space. We conclude that the city is not suffering and has no immediately foreseeable prospect of suffering from lack of industrial space. Furthermore, the lands sought to be annexed do not lend themselves well to industrial use.

Our conclusion is that the plaintiff did not prove a prima facie case of necessity and reasonableness for expansion on the ground pleaded, "that virtually all of the area within the present corporate limits * * * has been utilized for construction of new homes and industrial plants." That is the issue which the parties tried. However, we will proceed to an examination of the annexed area.

It would have been of considerable help to this court, and, we believe, to the very able and conscientious trial judge, had the plaintiff produced a map or plat showing the areas sought to be annexed, together with a plat of the city, in scale. The descriptions are by metes and bounds. The plaintiff did offer in evidence a scaled zoning map of the city which purports to show platted areas, streets, and highways. There was also introduced a sketch outline drawing purporting to show the boundaries of the city and the boundaries of the areas involved in the annexation. This outline drawing does not appear to be in scale. It is not vouched for by any engineer. It is certainly not the same scale as the zoning map. It would seem out of proportion to us in some respects and particularly, as will hereafter appear, does not show the position of some of the areas to be annexed in relation to certain portions of the city, which, in this case, becomes an important factor. For our own information and study we have been compelled to attempt to draw our own plat from the metes and bounds description. Generally the lands sought to be annexed can be divided into three tracts:

*East Area.* This approximately 80-acre strip, 600 feet in width, extends for a mile along the east side of the city limits and approximately a half-mile north and a half-mile south of Church Street (which is also present Highway 60). The principal part of the area north of the highway is the same type of torn-up old mining land which we have mentioned. Most of it lies alongside (east of) that portion of the city which plaintiff has contended and we have heretofore said should not be considered as suitable for development in its present condition. So far as the maps or any other evidence discloses, there is no connection or access from this north part of the tract to be annexed through the "valleys of the moon" and swamp land, by street or road, to the business or residential part of the city, except at the extreme south end by way of Church Street (Highway 60). There are no buildings or other development of any kind in this half-mile strip. Oddly enough, plaintiff's witnesses seem to be almost unanimous in the conclusion that it never has been and probably never will be developed, whereas a defendants' witness (no doubt envisioning good use of the bulldozer) says it *could* be.

The approximately one-half mile of the same strip lying south of Church-Highway 60 extends to even with the south line of the city. The north part of it runs alongside platted Zone B property within the city. The south quarter-mile of it lies immediately east of one of the Zone A tracts within the city which has never been developed (except for some houses on streets around the perimeter) but which practically all of the witnesses, both plaintiff and defendant, say is of such character that it is suitable for development. This portion of the east area sought to be annexed is a part of an agricultural tract and is devoted to agricultural uses. It contains a total of three houses. One house is (or was at the time of trial) in the process of construction.

Thus of this mile-long strip we find that approximately one-half is of such nature that it cannot be developed, and a goodly portion is actually cut off from the city by lands of similar nature. The other half is devoted to agricultural uses, and a part of it lies alongside lands within the city which, though conceded to be suitable, are not being used. Granted that under certain circumstances, because of the fact that a city is built up to a line, we might *infer* a need for extension a reasonable distance in order to maintain police and health protection, we cannot infer that because there might at some time in the future be a need for zoning along Church-present Highway 60 where it is about to enter the city (for instance, in order to regulate honky-tonks), such need will extend for a half-mile in each direction back from the entry street. Nor does the plaintiff plead or prove or offer any evidence on need of police or health regulation or to extend streets. The only argument made in behalf of need for annexation of the north half of the strip is that a portion next to the railroad on the north might be needed for industrial purposes. Such annexation could only give the city more of the same (by plaintiff's evidence) neglected and unused and unsuitable land. The only mention of anything affecting the south half of this mile strip is that there is a hog-feeding operation on this agricultural land. The raising and feeding of hogs is not an unusual or necessarily unhealthful use of farm land. There is no pleading and no showing or claim that such constitutes a health problem to the city. Assuming, as stated, that we might under some circumstances infer a need for some perimeter zoning, we cannot redraw the boundary lines of this area proposed to be annexed. We must take the proposition as submitted by the resolution authorizing the annexation. And we think that, under the state of the record we have before us,

the annexation of this one-mile strip is unreasonable and arbitrary.

*South Area.* The area on the south is contained in the same running description which includes the east area. We treat it as a separate area because it is, in reality, contiguous with the east tract only in the sense that the corners touch at the southeast city limits. As nearly as we can calculate and estimate, this area involves approximately 195 acres or more. It lies in irregular shape south of Hadley Street, which is the extreme south line of the present city limits. The area includes Bremer's First and Second Subdivisions and Young's First and Second Subdivisions, which adjoin Hadley Street.

Bremer's First and Second Subdivisions (both platted in 1958) lie in a narrow strip along Hadley for ½ mile from the (extended) east line of the city to State Highway 39, which is also Elliott Street. The subdivisions extend southward in depth 192 and 350 feet respectively, a total of 542 feet. The line of the area to be annexed extends south from Hadley a total distance of ¼ mile. The area south of Bremer's Subdivisions (778 feet by approximately ½ mile) is open, undeveloped land and has no improvements as far as the record shows. When within 300 feet of Highway 39, the boundary of the area to be annexed turns southward another ¼ mile to the section line. Then it moves west again 70 feet and then south for something less than half a quarter (probably to include the Empire District substation). Then it moves west *on a diagonal* 230 feet to Highway 39, thence west another quarter-mile on a diagonal, and, unless we are in error in our calculations, it cuts through the south portion of a cemetery lying east of the highway, leaving a diagonal slice of it without the boundary line.[7] Thence the westernmost line runs north for a quarter-mile plus

---

7. Assuming that we, and not the person or persons who prepared the metes and bounds description and who drew the unvouched-for sketch for the city, are not in error, we apprehend that this diagonal was not the intention of the city fathers but was occasioned by a jog in the section line. Those who lie at rest in the

620 feet; thence it jogs 105 feet farther west; thence north another quarter-mile to Hadley Street and the city boundary. The extreme limits of this irregular area are ¾ mile plus 150 feet east and west and ½ mile plus 620 feet north and south. We have mentioned Highway 39. A "long block" west of this lies an extension of Jefferson Street going ¼ mile. Adjoining Jefferson Street are Young's First and Second Subdivisions (approximately 20 acres), which (combined) front on Hadley and on the Jefferson Street extension. The area between Jefferson and Young's is unplatted, as is the land immediately south thereof. West of Young's the 150-foot strip is unplatted. Between Jefferson and Highway 39 the area is unplatted, as is that immediately south of Young's. Somewhere in this vicinity between the highways is a rabbit-chicken farm.

The whole area is said to contain a total of 63 houses, one church, and six small businesses. But so far as we can find from the record, practically all of them lie in Bremer's Subdivisions, along or close to Hadley's, in Young's Subdivisions, in the unplatted space between Jefferson and the state highway, and along such highway and street for *some* distance which we do not know. To show this was plaintiff's burden. The only houses or businesses which the evidence shows to lie south of Bremer's and south of Young's are one house on the unplatted portion and the Empire District substation. In the southwest portion of this area to be annexed and north of the Maple Park cemetery is yet another subdivision (Bunselmeyer tract), a replatting of an older (1891) subdivision of the southeast quarter of Section 13. There is no evidence of any improvements, nor is there any evidence of lots being held or offered for sale as city lots. Nor is there evidence as to their comparative value with tracts within the city. Although platted, this is being used as agricultural land.

■ We have no doubt that the City of Aurora has grown in this south direction, primarily along or adjacent to Hadley Street and along the highway and the Jefferson Street extension, and this is the normal growth of the city. A city should not and indeed cannot, except to a limited extent, control the direction in which its people choose to build. State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 399; Faris v. City of Caruthersville, supra, 301 S.W.2d 63. Normal growth may create conditions which make it necessary and reasonable that additional areas to a reasonable extent be annexed, although such necessity may arise from considerations (not pleaded or attempted to be proved here) of things other than lack of building space within the city. One of the doubts we have in regard to the reasonablenss of the annexation of this particular tract is the lack of evidence in regard to the southern portion—in other words, whether the city is attempting to reach beyond its immediate and reasonably foreseeable needs. Perhaps that doubt is aided by the fact that at a hearing before the State Highway Commission held (about a year and a half before trial) to determine the place of the proposed relocation of Highway 60, 600 feet south of Hadley, the mayor testified that such location would not interfere with growth or development of that area.

*West Area.* The portion of land sought to be annexed comprises 80 acres extending due west approximately ½ mile from the present city limits along the south side of (present) Highway 60 and ¼ mile south thereof. Nearly all of this area was formerly a part of an older subdivision called Wakefield's Subdivision (into small tracts).

cemetery will not object, but their loved ones who remain in life might, had they known, have objected. We do not regard this shearing off as determinative of the reasonableness of the whole annexation, but it is one of the many factors which we must consider.

of the northeast quarter of Section 14. Out of this old subdivision were carved several "French farm" type of subdivisions into lots. All of them extend ¼ mile south of Highway 60. The first, Fulp's, platted in 1956, is 247 feet fronting on 60 and contains 13 lots. This subdivision is between ½ and ¼ mile west of the city limits. We are unable to determine whether any houses were ever built upon or any lots ever offered for sale from it. In 1959 several other subdivisions were platted. Jenkins, which lies on west of Fulp's, has a 330-foot front on Highway 60 with 20 lots. It has four houses, including the owner's. Still farther on west from Jenkins is a strip comprising part of old Wakefield's Subdivision. It apparently is not laid off into lots and, so far as we can ascertain, has no houses. Still farther west and across the half-section line is another strip, 180 feet wide, which apparently has not been platted or developed.

Going back next east from Fulp's and toward the city limits is Gibson's Subdivision, with a width of 247½ feet, containing 13 lots with two houses. Still farther east and approximately ¼ mile from the city limits is Bisby's, with a width of 330 feet and containing 12 or 13 lots. It has one house. Next east toward the city is Simpson's Subdivision, with a width we do not know but calculate at approximately 330 feet. Apparently it contains 25 lots and one house. Still going on east, we come to the east half of Lot 9 of the old Wakefield's Subdivision, which has never been platted into small lots. We calculate this strip to be 330 feet wide and ¼ mile long. Apparently it is divided into six large lots.

A witness for the city testified that this whole west area to be annexed contains a total of 19 houses. We gather that the majority of them, other than the eight we have mentioned, lie in the part of old Wakefield's which lies next to the city limits.

The several small subdivisions are not contiguous to the city limits, but there would appear to be more houses in the unplatted area east of them and near to or adjoining the city than there are in all these subdivisions. We think it is a fair inference that most of these lots are held and offered for sale as city lots, although there is no evidence (as there is in none of the others) as to the enhancement of value by reason of proximity or the comparative value or asking and selling price of such lots in comparison with similar lots within the city.

*Annexed Areas As a Whole.* Practically all the annexed areas have, or have available to them, the utilties of gas, water, and electricity. They also have or have available fire protection through the Rural Fire Service. Their police protection is from the sheriff's office. We believe that the city can, if it will, within a reasonable time extend fire protection and sewer service to all of the territory proposed to be annexed, but that the extension of such would involve considerable expense and hardship to the owners of some of the outlying areas, particularly the Bunselmeyer tract; and that the city is also able to furnish such normal municipal services as police protection, health regulation, and street maintenance.

The fact that one or more portions of the annexed area are suitable does not make the whole annexation reasonable. City of Sugar Creek, Mo. v. Standard Oil Co., 8th Cir., 163 F.2d 320. As we have stated, we cannot contract or expand the boundaries as laid out by the city council. This we are not competent to do, and such would be an attempted invasion of legislative function. State ex inf. Major v. Kansas City, supra, 134 S.W. 1007, 1016; State ex inf. Mallett ex rel. Womack v. City of Joplin, supra, 62 S.W.2d 393, 397; City of St. Joseph v. Hankinson, supra, 312 S.W. 2d 4, 17; City of Fulton v. Dawson, supra, 325 S.W.2d 505, 518. The city should be permitted to redraw its own lines. We must take the resolution of annexation of the city council as a whole and determine whether such resolution was reasonable. In Williams v. City of Illmo, Mo.App., 279

S.W.2d 196, we did approve the annexation of one tract and disapprove the annexation of the other. An examination of the record in that case indicates there was but one ordinance, but the ordinance itself treated the two described tracts as separate annexations and the cause was tried on that basis. In this case the whole of the lands has been treated as one, and the necessity pleaded and tried was lack of available space within the city, an issue applicable alike to all lands annexed.

■ We have considered the various factors, the two most important of which we believe to be the lack of necessity for additional building space as pleaded and the unusability and unadaptability of a portion of the annexed area for city purposes. These, along with other considerations of possibly lesser character which we have mentioned, impel us to the conclusion that the plaintiff did not make and sustain its claim, and the judgment must therefore be reversed. Such being the case, it becomes unnecessary for us to rule upon the remainder of errors contended for by the appellant.

The judgment is reversed, and judgment for the defendants is directed.

STONE and McDOWELL, JJ., concur.