**CITY OF PERRYVILLE, a Municipal Corporation, Plaintiff-Respondent,**

v.

**Cyril (Syril) BREWER, Floyd Huber, Albert W. Bergman, John Brune & Albert Stueve, Defendants-Appellants,**

Charles L. Drury, Trustee, Kenneth Krauss, Dennis Sauer, Leo Miederhoff, Bill G. Bailey, Homer Roy, Michael J. Sutterer, Lawrence Feltz, Davis Farm Supplies, Inc., Perryville Development Corporation, and Gary Brewer, as members of a class composed of inhabitants of the area proposed to be annexed to the City of Perryville, Defendants,

**Adrian Giesler, Dorothy Giesler, Charles M. Kiefner and Marilyn S. Kiefner, Intervenors.**

No. 38425.

Missouri Court of Appeals, St. Louis District, Division Three.

Oct. 11, 1977.

John P. Bradshaw, Finch, Bradshaw, Storm & Steele, Cape Girardeau, for defendants-appellants.

Francis Toohey, Jr., Perryville, Buerkle, Buerkle & Lowes, Albert C. Lowes, David G. Beeson, Jackson, for plaintiff-respondent.

WEIER, Judge.

In this declaratory judgment action brought under the provisions of the Sawyer Act (§ 71.015 RSMo.1969), the City of Perryville sought authorization to annex a circumferential unincorporated area contiguous to its city limits. From a judgment favorable to the city, the defendants-appellants, who are residents and landowners in the area affected, have appealed raising as their principal challenge the sufficiency of the evidence to support the court's judgment that the proposed annexation was both reasonable and necessary.

After their appeal, defendants filed in this court a motion to remand the case to the circuit court because the city annexed several portions of the area which is the subject of this suit after the judgment was entered. Those annexations were alleged to have been accomplished under the provisions of § 71.012 RSMo.Supp.1976, which governs annexations petitioned by real property owners in the annexed area and not objected to by any interested persons. The portions of territory voluntarily annexed by this process consisted of 625 acres of St. Mary's Seminary, 90 acres of public school property, and a 10 acre subdivision, according to the appellants' allegations.

The motion asks that we send this case back to the circuit court for further proceedings in light of the voluntary annexations because the present declaratory judgment can no longer be complied with in terms of the territory to be annexed and because the voluntary annexations have effected a change in the electorate required to vote on the involuntary annexation under § 79.020 RSMo.1969. Before considering the merits of the appeal, we first digress to consider this motion.

■ Ordinarily, of course, we may not consider any facts outside the record unless they are subject to judicial notice. *State ex rel. Freeze v. City of Cape Girardeau,* 523

S.W.2d 123, 127[5] (Mo.App.1975); *Rawlings v. Taylor,* 477 S.W.2d 737, 739[1] (Mo.App. 1972); *City of Joplin v. Village of Shoal Creek Drive,* 434 S.W.2d 25, 28–29[4] (Mo. App.1968). Municipal ordinances, the method by which a voluntary annexation is accomplished, are generally not judicially noticed. Rather they must be proven like any other fact. *State ex rel. Freeze v. City of Cape Girardeau, supra* at 127[4]. In this case, however, we can consider the fact of the voluntary annexation, despite its absence from the record and our inability to judicially notice the enabling ordinances, because that fact was conceded by opposing counsel in his suggestions in opposition to the motion to remand. Such a concession brings the conceded fact before us. *See, Rawlings v. Taylor, supra* at 739[1]; *City of Joplin v. Village of Shoal Creek Drive, supra* at 28–29[4].

The issue is then presented whether the voluntary annexation of a portion of the disputed territory, subsequent to the issuance of a declaratory judgment under § 71.015, *supra,* authorizing the disputed territory to be involuntarily annexed, necessitates a remand of this case for further proceedings. The procedure necessary for a fourth class city, like Perryville, to involuntarily annex territory, as provided by § 71.015 RSMo.1969 and § 79.020 RSMo. 1969, requires the city to adopt a resolution to annex the unincorporated territory desired, file an action in the circuit court of the county in which the territory is located seeking a declaratory judgment authorizing the annexation and, if receiving the declaratory judgment, hold an election in which the voters of the city decide whether to annex.

Here, the City of Perryville adopted the appropriate resolution and asked for and received the appropriate declaratory judgment. That judgment authorized the annexation of the entire 2,940 acres of land in question and made way for the holding of an election among Perryville's voters on the desirability of the annexation. It is the defendants' contention that by voluntarily annexing [1] over 700 acres of the territory subsequent to the issuance of the declaratory judgment and prior to the holding of the election, the city has made it impossible for the circuit court's judgment to be complied with, in that the election can be held only as to the territory left after the voluntary annexation instead of the entire territory as contemplated in the circuit court's judgment. To support this contention the defendants cite two cases,[2] which are, however, irrelevant because they address the question of the circuit court's power to vary the territory proposed for annexation by the city. They do not address the question of the city's power to vary from the declaratory judgment of the court.

There is, however, one case which does consider the latter question. That case, *Young v. Mayor, Council and Citizens of City of Liberty,* 531 S.W.2d 732 (Mo. banc 1976), involved a situation in which a special charter city obtained the declaratory judgment required by § 71.015 RSMo.1969, but then varied from it by passing an annexation ordinance including less than one-half of the territory authorized to be annexed by the judgment.[3] The territory mentioned in the ordinance was, however, wholly within the territory mentioned in the judgment. *Young v. Mayor, etc., supra* at 735. The

---

1. The procedure to be followed for voluntary annexation of territory, as provided by § 71.012 RSMo.Supp.1976, is for all the real property owners in the unincorporated territory in question to petition the city for annexation. The city is then to hold a hearing at which all interested parties can present evidence on the annexation. If no written objection to the annexation is filed within seven days of the hearing, the city may then annex the territory by ordinance. No election is required.

2. *State ex inf. Major v. Kansas City,* 233 Mo. 162, 134 S.W. 1007, 1016 (1911); *City of Aurora v. Empire District Electric Company,* 354 S.W.2d 45, 55 (Mo.App.1962).

3. Under the statutes relevant to a special charter city, the city had only to pass a resolution to annex the desired territory, obtain a declaratory judgment authorizing the annexation, and then pass an annexation ordinance. No election was required. *See,* §§ 71.015, 81.080 RSMo.1969; *Young v. Mayor, Council and Citizens of City of Liberty, supra* at 734.

court held that a city may not vary from the declaratory judgment in that way and that § 71.015 required the city to obtain another declaratory judgment directed to the consideration of the revised territory desired for annexation only. *See, Young v. Mayor, etc., supra* at 737–739. The court said that "[i]n view of the effect of the burden which that legislation shifted to the city of establishing in advance the reasonableness of its annexation proposal and in view of the requirement that the petition for approval describe the area proposed to be annexed, it is reasonable to conclude that the legislature intended to require the city to comply with the Act with respect to the area ultimately annexed and to require judicial authorization for that particular action." *Young v. Mayor, etc., supra* at 738[9].

■ This language can be interpreted to either support or destroy the defendants' position. In one sense the city did not comply with § 71.015 with respect to the area ultimately to be annexed in that some portion of that area has been annexed under § 71.012 and the declaratory judgment obtained for the whole area will only be used to annex the remainder. On the other hand, all the territory subject to the judgment will be annexed to the city if the election is successful even though some of it will have been annexed by a different means. That differentiates this case from *Young*. Here, Perryville being a city of the fourth class, all the territory will be annexed after the procedure required by §§ 71.015 and 79.020. In *Young*, only half the territory was annexed by the time the statutory procedure was completely followed. The City of Perryville will not be varying the amount of territory annexed, as was true in *Young*, but will only be varying the method of annexation. The latter variance, unlike the former, cannot really affect the circuit court's determination as to whether the statute's requirements of reasonableness and ability to provide municipal services are met. For these reasons, we hold *Young* inapplicable to this case. The city's variance from the declaratory judgment does not invalidate the proceeding so as to require that it apply for a new declaratory judgment.

■ The defendants' other contention is that the voluntary annexation has increased the city's electorate beyond what it was at the time the judgment was issued and thus has diluted the votes of other city residents who might oppose the annexation in violation of § 71.015. The defendants cite no authority in support of their contention that enlarging the electorate voting on annexation violates § 71.015. Nor have we been able to find any supporting authority for this contention. Moreover, it appears that the only people whose rights could be prejudiced by an enlarged electorate are those who were city voters before the voluntary annexation. Logically, it is to protect city voters' rights that an election on annexation is required at all. But voluntary immigration of new voters into the city between judgment and election could not be prevented under normal circumstances. Furthermore, there is no way the rights of the defendants, people who currently live outside the city, could be prejudiced by the enlarging of the city electorate. The rights of defendants are protected by the requirement that the city bring a declaratory judgment action against them in which the city must prove the reasonableness of the annexation. The size or persuasion of the city electorate cannot affect the decision on the declaratory judgment. Since the appellants cannot be prejudiced by this change in the electorate after the issuance of the declaratory judgment, there is no reason to remand the case on that basis either. The motion to remand is denied.

After this diversion in a collateral but important area, we turn to the merits of the appeal, first considering the attack on the judgment for insufficiency of the evidence to support it.

■ The Sawyer Act (§ 71.015 RSMo. 1969) requires that the city allege and prove not only that the annexation be reasonable and necessary to the proper development of the city but also that the city be able to

furnish normal municipal services to the unincorporated area within a reasonable time after the annexation becomes effective. Although the statute is couched in general terms, in applying it, the case law has set up certain standards under which the evidence may be weighed and considered by the trial court before arriving at a decision. Although not exclusive, a listing of such criteria would generally include these: (1) there must be a need for residential or industrial sites within the proposed area; (2) the city is unable to meet its needs without expansion; (3) only needs which are reasonably foreseeable and not visionary should be considered; (4) past growth may be relied on to show future necessity; (5) in evaluating future needs, the extent to which past growth has caused the city to spill over into the proposed area should be considered; (6) the beneficial effect of uniform application and enforcement of municipal zoning ordinances in the city and in the annexed area may be considered; (7) also to be considered is the need for or the beneficial effect of uniform application and enforcement of municipal building, plumbing and electrical codes; (8) the need for or the beneficial effect of extending police protection to the annexed area; (9) the need for or the beneficial effect of uniform application and enforcement of municipal ordinances or regulations pertaining to health; (10) the need for and the ability of the city to extend essential municipal services into the annexed area; (11) enhancement in value by reason of adaptability of the land proposed to be annexed for prospective city uses; and (12) regularity of boundaries. *City of Mexico v. Salmons,* 514 S.W.2d 102, 104 (Mo.App.1974); *City of Houston v. Duff,* 338 S.W.2d 373, 379–80 (Mo.App. 1960); *City of Fulton v. Dawson,* 325 S.W.2d 505, 516 (Mo.App.1959). As we have said, however, in *Dressel v. City of Crestwood,* 257 S.W.2d 236, 249[7] (Mo.App.1953), it is not necessary that all of the factors which have been listed above as proper to be considered in determining the question of reasonableness should be present before an annexation will be declared valid. "On the contrary, a case of reasonableness is made where it appears that the land annexed is so situated as to be adaptable to urban purposes, and necessary or convenient to reasonable exercise of the city government." *Dressel v. City of Crestwood, supra* at 249. *See also, City of Cape Girardeau v. Armstrong,* 417 S.W.2d 661, 676[7] (Mo.App.1967). After this brief review of the law within which the framework of this case is set, we turn to the facts because each case is a separate problem to be considered under its facts. *City of St. Joseph v. Hankinson,* 312 S.W.2d 4, 17 (Mo. 1958).

The City of Perryville is the county seat and principal city of Perry County. It lies near the geographical center of the county and is principally located between two parallel highways. U.S. Highway 61 runs northwest-southeast through the city with a small portion of the city on the northeast side of this highway. Interstate Highway 55 also runs northwest-southeast and lies less than a mile southwest of the existing city boundary. If the area proposed is annexed, the city would then appear like a gymnast between two parallel bars supported on one side by Interstate Highway 55 and on the other by U.S. Highway 61 with a good portion of his weight upon and over this last highway. Traversing north to south through the city as it now exists is Missouri State Highway 51. Extending radially from the city are state maintained Highways B, K, T and E. Perryville's population constitutes over one-third that of the entire county.

■ Extensive evidence including numerous exhibits was adduced by the city. Assisting in the compilation of this material were the director and personnel of the Southeast Missouri Regional Planning and Economic Development Commission, an organization formed by local governments in that area. In addition, engineers engaged in sewer and water planning and construction appeared as witnesses. Heads of the municipal departments, officers of the city government, the superintendent of public schools, local bankers, real estate brokers, owners of land in the area proposed to be

annexed and others testified. From this large compendium of information we have attempted to correlate and summarize substantial evidence which we consider supportive of the judgment, for we are bound to sustain that judgment unless it lacks substantial evidentiary support. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Such a review is not, however, a trial de novo in which we assess the evidence. Rule 73.01; *City of Jefferson v. Smith*, 543 S.W.2d 547, 550[6] (Mo.App.1976). Because of the great quantity of evidence, we have outlined the facts favorable to the city generally under the factors above enumerated.

1. Growth in the City and Surrounding Area Proposed to be Annexed

(a) Population

By house count the population of Perryville in 1976 was calculated to be 5,247 persons. This was an increase of 98 over the 1970 census and was somewhat over the slight growth of 32 people between the census of 1960 and that of 1970. Occupied housing units within the city were 1,874 units in the year 1976. Approximately 2,000 persons are living in the adjacent area proposed for annexation but about 100 of these are seminarians and other personnel located at St. Mary's Seminary, a Catholic religious institution occupying 625 acres next to the west boundary of the city. The present city contains approximately 1,049 acres. The population density would therefore be approximately 5.2 persons per acre. The area proposed to be annexed contains 2,940 acres. One of the expert witnesses testified that the optimum density for a city like Perryville is 255 acres per 1,000 persons or approximately four persons per acre. If the proposed territory were added to the city, its density would drop to 1.8 persons per acre (2.1 persons per acre if the seminary's population of 100 and territory of 625 acres total were excluded).

(b) Land Areas and Their Use

In the city, nearly all of the land is already developed. There are no vacant lots in the city which are zoned commercial or industrial. Only a few vacant lots in the city zoned residential are available and most of these are either too small to be desirable for home building or present topographical problems. Some of these vacant lots do not have services such as sewer lines extended to them.

The area proposed for annexation encompasses 2,940 acres. Of this, 720 acres are already developed for residential, commercial, industrial or other uses. In the proposed area are 16 subdivisions platted with 594 lots. Other undeveloped acreage is firmly committed to various uses for the foreseeable future and so is unavailable for development. This includes 625 acres owned by St. Mary's Seminary, 95 acres in a still unoccupied industrial park, about 25 acres for the County Nursing Home, and 90 acres owned by the public school system. Already developed land and land committed to use other than residential, commercial or industrial use totals 1,720 acres leaving 1,220 acres of the land remaining able to be developed. Less than half of this land is currently being used for agricultural purposes.

Much commercial development in the area proposed for annexation has already occurred near the intersection of Missouri Highway 51 and Interstate 55 south of the city. There is also much development along that portion of U.S. Highway 61 which is northwest of the city and along that portion of Missouri Highway 51 which is north of the city. V-shaped areas lie between these developments with the more remote land within the V's still used for agricultural purposes. There is also an extensive development along that portion of U.S. Highway 61 southeast of the city. In the proposed annexation area there are 65 businesses and industries and 650 residential units.

(c) Zoning and Regulation of Land Use

Perry County has no zoning and planning. The City of Perryville, however, has zoning regulations and land subdivision regulations which provide for six general classifications. A city plan commission studies all proposed changes and modifications and

reports to the board of aldermen. A public hearing with notice is afforded before any change is made. The zoning ordinance defines certain requirements such as minimum lot size, building height limits and off-street parking restrictions. Without such regulation and planning it is difficult to provide orderly development in a manner that promotes health, safety, convenience and welfare of the inhabitants of the community.

### (d) Local Topography and Geological Formations

Much of the surface drainage of Perryville and vicinity flows into a stream, Cinque Hommes Creek, which in turn flows in a northeastward direction from the city. A large part of the area, however, is drained by sinkholes or basis with interior drainage that have no defined streams flowing from them. This drainage flows into underground streams which find passages through the limestone formations underlying this area. This has given rise to a serious sewage disposal problem because many people not served by sewer lines particularly those in outlying areas have either made a practice of running raw sewage into the sinkholes or of diverting effluent from sewage lagoons or other types of primary treatment into the underground area. Testimony disclosed that the underground streams and caverns contain a large amount of untreated sewage. The evidence indicated that one reason for choosing the limits in the area for annexation was to have a centralized sewage system to replace the sinkhole drainage practice.

The unstable condition of the land in certain areas near the sinkholes have also created problems with respect to the construction of buildings, roads and other improvements.

### 2. Extension of Municipal Services

### (a) Police

Much evidence at the hearing concern the condition and capabilities of various municipal services. In regard to police protection, with the exceptions of a hired watchman service at a shopping center outside the present city limits, much of the surrounding area is served by the county sheriff's office. This, because of its nature, is limited. A few of the city police are also deputy sheriffs who can perform police duties outside the city limits but most of the police of the City of Perryville are confined to the city itself. Both the city police and the county sheriff currently share a dispatching system and jail facilities. When the city police department is at its full current strength, it has ten full-time officers including the chief. Upon annexation the department intends to hire four additional officers. The chairman of the police committee of the board of alderman testified that the city had money available for such hiring. Two additional police cars were recently purchased in anticipation of the requirements which might be imposed on the city by the annexation, bringing the total of the cars used by police to five.

### (b) Fire Protection

The chief of the fire department testified that the local department was manned by volunteers, the firemen being paid for fires actually attended. The present basic protection to the territory outside of the city was on a fee basis, but this protection was not guaranteed and fires in the city get first priority. Only one of the two pumper trucks were allowed to be sent outside the city limits at any one time and if no water hydrant was available in the area, water had to be pumped out of ponds or other available sources. In addition the department had 700 gallons on the pumper itself with additional tanker supplies. There are 16 volunteer firemen. Adequate protection can be provided to the proposed area with current personnel and equipment. If the annexation is completed, the city is planning on buying additional fire engines. A new firehouse has sufficient room for all of this equipment.

### (c) Streets and Trash Pickup

The chairman of the street committee of the board of aldermen testified that the

street department had eleven full-time employees and hires more during the summer months. The highways in the to-be-annexed area would generally be maintained by the state but the street department with its current strength would have sufficient men to maintain and improve streets in the outlying area. If the current street improvement program is approved, all current city streets except those with no buildings will be paved. The city has adopted a street plan by passing an ordinance which adopted the annexation study done by the Southeast Regional Planning Commission as the city plan and this would include building new streets in the proposed annexation area. The street department also operates trash pickup trucks and personnel. The city recently joined with the county in purchasing a land fill for trash and solid waste. Current plans would include the purchase of a trash compactor and add two men to serve the annexed area. All of this would probably entail a monthly charge in the future.

### (d) Gas Distribution and Electricity

The city maintains a gas department which distributes natural gas in and around the city. The head of that department testified that gas was distributed to over 1,800 customers in the city and over 600 outside of it. Ninety percent of the northern half of the annexed area is already served by the gas department. Little of the southern half is now being served so that service in that area would require additional gas lines. The city has been notified by the gas supplier that the city's allocation is limited because of the current energy shortage and there is only enough gas now for approximately 70 new customers which could be added with no additional equipment. Some additional personnel would be needed to operate the department with the additional territory to be served.

The electricity is supplied by a private utility company and the supply of electricity is adequate for the entire area.

### (e) Water and Sewage

One department in the city takes care of both water treatment and distribution and sewage collection and treatment. The head of that department testified that he had eleven employees working under him. If annexation occurs he will need four additional employees. The department will also need two additional trucks. The city obtains its water from two sources. One is Saline Creek west of the city where the water treatment plant is located and the other is a deep well located within the city limits. There are two storage facilities, one for 500,000 gallons and another for 75,000. The water system has about 2,000 customers within the city and about 400 outside of it.

In 1973 an engineering firm recommended the city make certain improvements in the water treatment plant. These improvements are being made but some have been postponed due to cost. Among the more immediate improvements suggested are another deep well and another 500,000 gallon standpipe. In addition there should be some 34,000 feet of new, larger water lines. The new deep well is needed because the present supply of water is limited enough to require the water system to run at full capacity for sixteen hours a day to supply the maximum daily requirement of water for the present customers. Although the system could run in excess of this time, it is not recommended. Because of the current demand, the engineering firm employed by the city to survey its needs and to plan the improvements in the water system have cautioned against adding more than 100 new customers until the new well is constructed. The city has tentatively adopted a plan to make the recommended improvements. These improvements could all be completed within one year. There are at least 100 new customers outside of the city who could be added to the current system and there are only 229 outside the city limits that are presently unserved by Perryville. The St. Mary's Seminary has its own water system and many of the others are presently being served by private sources or by two sepa-

rate public water supply districts who operate in or near the proposed area to be annexed.

The sewer system is currently in the process of being substantially improved. A new sewage treatment plant southeast of the city designed to replace two present plants has been largely completed. Also mostly completed is an outfall sewer line designed to carry sewage to the new plant and bypass the old north treatment plant. Another nearly completed project is the lift station and interceptor line designed to carry sewage to the new plant and bypass the old south treatment plant. When put into operation these three projects will enable the sewer system to handle sewage produced by 9,000 people. It will process 900,000 gallons of liquid waste per day. The city is currently producing 450,000 gallons a day and the annexed area would only add 200,000 gallons at this time. As a result the treatment plant will not reach capacity for ten to twenty years if there is annexation. As for connecting the proposed annexation area to the sewer system, evidence was presented that the new outfall sewer line had been built with the thought of servicing the annexation area that it goes through. Plans to extend sewer service to most of the rest of the annexation area have been tentatively adopted by the board of aldermen. Those few areas not covered by the proposed new sewer lines if privately developed could obtain sewer service by requiring the developer to construct the lines. Construction of new lines could also be accomplished through the creation of sewer districts. Another project for which bids were being let out at the time of the trial of this case consisted of eleven subprojects designed to connect sewer lines to the regular sewer system where the sewage is currently discharging waste matter into sinkholes. Another project consists of seven subprojects designed to extend sewer services to areas presently unserved by sewers. Another nine subprojects are designed to upgrade the existing sewer system. Bids were being let out on these projects at the time of the trial. At the time of trial only two areas outside the city were actually served by the municipal sewage system, one a subdivision and the other a shopping center. Because of clean water laws and regulations of the federal government and the state and the insistence of various agencies on regional treatment facilities, the annexation and use of the municipal plant will save landowners outside of the current limits much additional cost in improving or providing individual disposal systems.

#### (f) Surface Drainage

The city has some storm water drainage problems due to the scarcity of storm sewers. This results in storm water draining into sinkholes and occasionally overflowing. The city engineer has drafted a plan to alleviate the most severe problems at a minimum expense. There is only one storm water problem in the annexation area but according to the city engineer, this could be alleviated in an economically feasible manner.

#### (g) Recreation

The city owns and maintains a 56 acre park adjacent to U.S. Highway 61. In the park there are four hard surfaced tennis courts, three lighted baseball diamonds and a municipal swimming pool. Eleven covered pavilions provide shelter for picnickers. The largest of these will accommodate about 25 to 30 picnic tables. Other tables and barbeque pits together with playground equipment are found throughout the park. One full-time employee maintains the park. He is assisted by three part-time employees. At time of trial no restriction prevented use of these facilities by those outside the city. The city plans to acquire and maintain additional parks in the annexation area.

#### 3. Financial Condition and Ability to Pay for Extension of Services

A preliminary estimate of the cost of major capital expenditures extending services to the annexation area over a ten-year period puts the amount at approximately $2,600,000. Other major expenditures to be made by the city to improve municipal serv-

ices within the city have been preliminarily estimated to cost about $600,000. Total funding in the amount of $3,200,000 will have to be provided in order to complete all of the major planned improvements and municipal services in the city and area proposed for annexation.

The city currently generates about $150,000 a year in general taxes and it should be able to raise in tax money at least $40,000 more from the area to be annexed. Its bonding capacity for general obligation bonds is at least $1,400,000. Because there are some general obligation bonds outstanding, the remaining bonding capacity of the city is about $675,000. Including the annexed area would add an additional $400,000 to the available bonding capacity. Making some planned larger payments on outstanding bonds, an additional $100,000 bonding capacity would be available within three years. The city has paid $700,000 worth of gas revenue bonds issued in 1960 to leave a balance of $400,000 and has reserves of $225,000 on hand to pay off the balance. In 1974 $300,000 worth of water and sewer revenue bonds were issued thus effectively cutting off the city's ability to issue any more water or sewer revenue bonds for at least a few years. The city has one of the highest ratings among municipal bonding houses. As a result it has been able to obtain lower interest rates. It has no trouble in paying all of its bills including principal and interest on its bonds and has from $400,000 to $900,000 cash balance each year after paying its expenses.

In addition to obtaining funds from bond issues and taxes, the city can obtain financing for additional services by passing the cost on to people who need the services. Thus new sewer lines can be constructed by the formation of sewer districts and passing the cost on to the ones who need the sewers in a particular area. In addition developers in the outlying areas can be required to put in water lines, sewer lines and streets according to city plans and specifications. The city also plans to apply for federal and state funds to help finance the needed improvements. In the past it has received such funds for projects like the new sewer treatment plant, a large part of the cost having been funded through those sources. Because of increased population if the annexation is completed, the city expects to obtain increased gasoline tax and revenue sharing money. It is doubted that service charges will assist much in the construction of the expensive facilities needed. Most people outside of the city already have water service and few additional sewer customers can be added until the improvements are made. If, however, a proposal to raise water rates is implemented, this could be an additional source of funds needed for the operation of city services. The city treasurer testified there would be enough money available to commence providing normal municipal services to the annexed area in most categories.

4. Increase in Value of Surrounding Land

There is little testimony with regard to the increase in value of the land surrounding the city. Much residential and commercial development had taken place. It could be expected that value of land in close proximity to or in the city itself would be more than land some distance away from the intensive development of the urban area. One defendant who was a retired farmer and lived on about 85 acres, 40 of which would be within the proposed annexed area, admitted that the land was worth much more by reason of being close to town. Another owner of agricultural land testified that he had offered some of his property on the back of his holding for $2,000 an acre and that land closer to the road would be worth more.

5. Regularity of Boundaries

The boundaries for the proposed annexation appear to have been established on a rational and regular basis. According to the report of the Regional Planning Commission, an exhibit in the case, the boundaries were established according to certain principles. These were: (1) the need to establish and maintain uniform and regular

city boundaries in all areas unless exceptional circumstances existed; (2) established survey and section lines were followed wherever possible; (3) individual property lines were followed where survey or section lines were not applicable except in those cases where following property lines would result in conflicts with the intent and purpose of the annexation; and (4) the use of surveyed lines for annexation purposes only was limited to those areas where no other suitable lines existed.

Our consideration of the evidence favorable to the city causes us to believe that the defendants' main attack on the court's judgment has been repelled. Defendants contend that the evidence is insufficient to support the court's determination that annexation was reasonable and necessary for the proper development of the city and that the city would be able to furnish normal municipal services to the annexation area within a reasonable time after annexation. The burden of proof is, of course, on the city to show that these tests set out in the Sawyer Act, *supra*, have been met. *City of Jefferson v. Smith*, 543 S.W.2d 547, 549[1] (Mo.App.1976); *City of St. Ann v. Buschard*, 356 S.W.2d 567, 575 (Mo.App.1962). This burden is met, however, if the evidence at least shows that the reasonableness of the municipal legislation to annex is fairly debatable. When such a showing is made, the action of the municipal legislative body is conclusive on the courts. *City of Jefferson v. Smith, supra* at 549[2]; *City of Des Peres v. Stapleton*, 524 S.W.2d 203, 207[7] (Mo.App.1975); *City of Odessa v. Carroll*, 512 S.W.2d 862, 866[1] (Mo.App.1974).

 From the evidence, we conclude the annexation proposed by the city is both reasonable to the city and to the area to be annexed. After considering the evidence concerning the growth patterns and extension of planning and services, we are led to the inescapable conclusion that annexation is both reasonable and necessary. Even where there may have been some conflicting evidence and opposing expert opinions, the factual data and opinions in support of or in opposition to annexation caused the issues to be at least fairly debatable. This being so, the action of the board of aldermen of Perryville in adopting the ordinance to annex cannot be attacked on the basis that the board exercised its power unreasonably.

 One of the principal arguments advanced by the defendants concerned the size of the area to be annexed. Defendants pointed out the fact that the city as it is presently contained has an area of little more than one-fourth of the total land area after annexation. The evidence indicated, however, that the city has already more densely populated than the optimum suggested by one of the experts; that there is a complete absence of commercial and industrial building sites in the city and a shortage of desirable residential building sites. Although defendants contend that Perryville is not really a growing city needing room for expansion, the contrary is indicated by the fact that the city has spilled over its boundaries out along the highways leading to the city and into desirable residential areas outside of the city limits. Much commercial and industrial enterprise has gone to this area. Although Perryville itself has not grown in population significantly the surrounding area has grown in part at least because of lack of space within the city's own boundaries. *Cf. City of Mexico v. Salmons, supra* at 104–105[4–6]. Mandatory planning and zoning in surrounding undeveloped areas along with the necessity of effective sewage disposal make extension of the city into the outlying area almost imperative.

Perhaps as much as twenty percent of the annexation area is currently used for agricultural purposes. But the fact this land is being used for agricultural purposes does not preclude its annexation. *City of Creve Coeur v. Brame*, 446 S.W.2d 173, 177[5–7] (Mo.App.1969); *City of Cape Girardeau v. Armstrong, supra* at 678; *City of Fulton v. Dawson, supra* at 517–18[7–9]. Much of this land appears to be adaptable for urban purposes because it is virtually surrounded by areas of development. Furthermore, in order to make the boundaries regular, it

would be necessary to include these in the proposed annexed area.

Defendants further contend, somewhat collaterally, that the judgment of the trial court was erroneous in finding annexation of territory to be reasonable by a city which failed to comply with the state statutes requiring cities to operate on a budget. It appeared from the testimony of the city treasurer and an accountant who audited the city's receipts and expenditures that a formal budget was not prepared each year as required by § 67.010 RSMo.1969. But it also appeared that the treasurer and the mayor and board of aldermen used the financial statements prepared by the firm of accountants who audited the city as a basis upon which they estimated the succeeding year's income and expenses necessary to operate each of the city departments. If additional funds were needed, a study was made of the financial condition of the city, the balances which it had and a determination would then be made as to whether additional expenditures in any particular category should be made. Although we do not condone the city for failing to comply with the directions contained in the statute, the evidence indicated conservative financial management of the affairs of the city and substantial funding to take care of necessary expenditures. Failure to comply with the statute did not detract from ample evidence of the city's ability and willingness to furnish normal municipal services to the annexed area within a reasonable time. *Cf. City of Mexico v. Salmons, supra* at 106. Here the city although having no formal budget has no difficulty in paying its bills and finding funds for municipal improvements. It has not over extended itself either in current expenditures or by using up all of its bonding capacity. We find this contention without merit.

Defendants' final contention concerns the trial court's findings of fact. They charge that these findings are contradictory. We have examined them closely and find no essential contradiction.

The motion to dismiss the appeal is denied. The trial court's judgment is affirmed.

KELLY, P. J., and GUNN, J., concur.